# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## JANUARY TERM, 1877.

[No. 5478.]

### R. PACHECO *v.* THOMAS BECK.

$$\begin{array}{cc} 52 & 3 \\ 132 & 285 \end{array}$$

DUTY OF CLERK AND SECRETARY OF STATE IN ELECTIONS.—When a Board of Supervisors has canvassed the returns of an election, and a record thereof is made and entered in the minutes, and has been authenticated by the signature of the Chairman of the Board and the Clerk; a copy of such record is the "abstract" which the Clerk is required to transmit to the Secretary of State, and upon which the Secretary of State must act in estimating the number of votes cast in the county for each person voted for as a representative in Congress.

IDEM.—If the Clerk of a county transmits to the Secretary of State a statement of what transpires in relation to the canvass made by the Board of Supervisors, of the votes cast in a county, which statement is not the record, but is in addition thereto or in explanation thereof, such statement is to be rejected by the Secretary of State.

MANDATE TO SECRETARY OF STATE TO ISSUE CERTIFICATE OF ELECTION.—If the Secretary of State refuses to estimate the votes given for members of Congress, as shown in the records of the counties transmitted to him by the Clerks, and to issue a certificate to the person having the highest number of votes, he will be compelled to do so by writ of mandate.

APPLICATION to the Supreme Court for writ of mandate.

The defendant was Secretary of State.

The abstract " *a*," and the statements " *b* " and " *c*," appended to the opinion of Mr. Chief Justice WALLACE, were contained in the petition for the writ. and the two latter were inserted as

reasons why the Secretary of State had failed to estimate the vote according to the abstract "*a.*" The other facts are stated in the opinion of Mr. Chief Justice WALLACE.

The defendant demurred to the petition.

*Estee & Boalt, Delos Lake, J. B. Felton,* and *Creed Haymond,* for the Petitioner.

*Hewell & Turner, Burch & Griffith, J. P. Hoge,* and *T. W. Freelon,* for the Respondent.

By the Court, RHODES, J.:

The statute in defining the jurisdiction and power of Boards of Supervisors, provides that they shall have power "to establish, abolish, and change election precincts, and to appoint inspectors and judges of elections, canvass all election returns, declare the result and issue certificates thereof." (Pol. Code, sec. 4046.) Each of these several duties are incumbent on those Boards as Boards of Supervisors. In canvassing election returns they do not become Boards of Canvassers, limited as to their powers and the period of their existence, but the same Board that establishes an election precinct also canvasses the election returns. It is provided by sec. 4030 that a record of the proceedings of the Board of Supervisors shall be kept; and sec. 4029 provides that the records must be signed by the Chairman and Clerk of the Board. A record kept and authenticated in the manner provided by those two sections is the evidence of the proceedings of the Board, and is the only evidence thereof, in cases where the proceedings are required to be entered of record.

The Board is required by sec. 1281 to canvass the returns "by opening the returns and estimating the vote of such county or township for each person voted for, and for and against each proposition voted upon at such election, and declaring the result thereof." Prior to the passage of the Act of May 18th, 1861, (Stats. 1861, p. 529) the statute required the county clerk "to estimate the vote of the county or township," and to prepare and sign a statement thereof; but no provision was in force

requiring the statement to be made a matter of record.    The Amendatory Act of 1861 above mentioned required the Board of Supervisors to canvass the election returns, estimate the vote of the county for each person voted for, and for and against each proposition voted upon, and declare the result thereof; and the Clerk was required to enter upon the records of the Board a statement of the result of the election.    One of the obvious purposes of the act was to require the result of the canvass to be made a matter of record among the proceedings of a Board which was required by law to keep a record of its proceedings, in order that such record should constitute evidence of the result of the canvass of such election, and as evidence should have the same force and effect, and the benefit of all the intendments in its support that the record of any other proceeding of the Board would have.    It was intended that such record should constitute the basis of all future action in respect to the election; and, accordingly, the Clerk was required to transmit to the Secretary of State certified copies of such statement in respect to all officers voted for at such election, unless the election was held for the election of township officers only—in other words, that the Clerk should transmit a copy of a record, instead of a copy of a mere fugitive paper in his possession.    The Political Code contains substantially the same provision as the Act of 1861; its purpose was the same, and it was intended that the record therein provided for should have the same force and effect as the record provided for in the Act of 1861.

The Clerk is required by sec. 1288 of the Political Code, " so soon as the statement of the vote of his county is made out and entered upon the records of the Board of Supervisors," to make a certified abstract of so much thereof as relates to votes for persons voted for by the electors of the State at large, etc.    It is contended on the part of the respondent that the Clerk is required to make an abstract, not of the record as authenticated by the signature of the Chairman of the Board and the Clerk, but of the statement of the result of the election as entered upon the records of the Board by the Clerk, without regard to the authentication of the record.    And it is further contended, that the statement to be entered by the Clerk is the statement of the

result as declared by the Board at the time of making the can-
vass, without any regard to errors that may have been discov-
ered and corrected before the record was authenticated. If
this proposition can be maintained—that is, if the Clerk is re-
quired to give a certified abstract either of the tabulated result
of the election as shown by the papers on his table, or of the
result as orally announced by the Board, or of the Clerk's entry
in the records, before the record is authenticated, then the pro-
vision requiring the result to be made a matter of record is not
only useless, but is absurd. It would be a misnomer to call that
a record which could be contradicted by such means. It is, in
my opinion, beyond all question, that the statement of the result
contemplated by the Code is not such statement until it is made
a matter of record, and that it is not a matter of record, within
the sense of the Code, until it is authenticated by the signatures
of the Chairman of the Board and the Clerk. And it is, in my
opinion, equally unquestionable that, in this proceeding, the
only evidence of the result of the canvass, or of the result as
declared by the Board, or of the statement of such result, is the
record of the Board. We are not called upon in this case to
determine what would be the value or effect of an entry of a
statement in the records of the Board without the record being
authenticated as provided in the Code; but, in my opinion, such
statement, when entered by the Clerk and authenticated in the
mode provided by the Code, cannot be contradicted, in a collat-
eral proceeding, by evidence of facts or matters existing or
transpiring before the authentication of the record.

The word "abstract," in the provision of sec. 1288, that the
Clerk "must make a certified abstract of so much thereof," etc.,
means a certified copy; and this is conceded by the respondent,
and the certified copy which the Clerk is required to make and
forward to the Secretary of State, is, in my opinion, a certified
copy of the proper portion of the records of the Board of Su-
pervisors.

The petition in this case contains one certified abstract of the
record of the statement of the result of the election, dated on
the 17th day of November, 1876, and marked "Exhibit A,"
which conforms to the law in that regard, and there is no other

document in the case which purports to be or can be regarded
as a certified abstract provided for by sec. 1288. The document
dated December 8th, 1876, marked " Exhibit B," does not pur-
port to be a copy from the record, but purports to be a copy in
part, and in part a recital of matters transpiring before the
record was made up, and contains figures which the Clerk cer-
tifies are not in the record.

If it be conceded that the Secretary of State is vested with
certain discretionary powers, and if the exercise of those pow-
ers may be involved in the determination of the question as to
which one of the two documents is the certified abstract pro-
vided for by the Code, to be determined by the inspection of
the documents, to ascertain which one bears the proper official
signature and seal, and is in due form—of all of which matters
he must take notice—there is here no room for the exercise of
such discretionary power, for he has before him only one docu-
ment which purports to be such certified abstract.

The law does not vest him with authority to inquire whether
the Board of Supervisors correctly canvassed the returns from
the several precincts, or whether the record correctly states the
result of the canvass, as made or declared, or whether the rec-
ord was properly made up; nor to investigate any question re-
lating to the proceedings which were had prior to the making of
the certified abstract. That document, being in the form pre-
scribed by law, is the only one upon which he is required or au-
thorized to act in his official capacity in estimating the vote of
the district; and neither his power nor duty in that regard
is enlarged or changed by reason of the fact that there are in
his office other papers or certificates, for which no provision is
made by the election laws.

It is his duty, in comparing and estimating the votes as pro-
vided for by sec. 1346 of the Political Code, to compare and
estimate the votes contained in the certified abstract dated the
17th day of November, 1876, marked " Exhibit A."

Demurrer to the petition overruled.

WALLACE, C. J., concurring:

The petition of Romualdo Pacheco, praying that a writ of *mandamus* issue against the respondent, Secretary of State, sets forth that at an election for Representative in Congress from the Fourth Congressional District, held on the 7th day of November last, the petitioner and P. D. Wigginton were the only candidates for that office, and that the petitioner received nineteen thousand one hundred and four (19,104) votes, and Wigginton nineteen thousand one hundred and three (19,103) votes, and no more, the actual majority of the petitioner in the district being one vote.

He further alleges that in the County of Monterey, which is included in the said Fourth Congressional District, the petitioner received 1,208 votes, and the said Wigginton 986 votes, and no more; and that at the voting precinct of San Lorenzo, which is in said County of Monterey, the petitioner received 51 votes, and the said Wigginton 27 votes, and no more.

It is also set forth in the petition that on the 15th day of November, 1876, John Markley, at the time being County Clerk of the said County of Monterey, delivered to the respondent Thomas Beck, Secretary of State of the State of California, an abstract designated by said County Clerk "Abstract of statement of vote of Monterey County, California, polled at the election held November 7th, A. D. 1876, relating to votes for persons for Representatives to Congress," by which abstract it was made to appear, and did distinctly appear, that the said Wigginton received in the County of Monterey nine hundred and eighty-six (986) votes, and no more, and at the voting precinct of San Lorenzo twenty-seven (27) votes, and no more. (*a*)

The petitioner further alleges that under these circumstances, and on the 28th day of December, 1876, he demanded of said respondent that, as Secretary of State, he should compare and estimate the votes so given in the Fourth Congressional District, and in such comparison and estimate should accept and act upon the said abstract of the 15th day of November, 1866, but that the respondent refuses to comply with the demand of the petition in that behalf.

If these, and only these facts had been set forth in the petition the right of the petitioner to the specific relief he seeks could scarcely have been questioned in any quarter.

The statute declares (Code Civ. Proc. sec. 1085) that the writ of *mandamus* may be issued to any person " to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station," and an examination of the provisions of the Political Code will show that it was the duty of the respondent to compare and estimate the vote of the Fourth Congressional District, and in so doing to consider the abstract of November 15th, 1876, as a basis of such comparison and estimate. The abstract was in all respects an official paper, prepared and forwarded to the Secretary, in pursuance of the express commands of the statute, and was founded upon the record of the Board of Supervisors, then being in the custody of Markley, the County Clerk, by whom, as has been seen, and under whose official seal, as being such Clerk, it was duly certified and forwarded. The record of the Board of Supervisors of Monterey County, upon which the abstract was founded, is a record provided for by law, and the County Clerk of that county is its appointed custodian and keeper. The entries made by the Clerk in the proper book, setting forth, or purporting to set forth, the proceedings of the Board of Supervisors in canvassing election returns, whether amounting to a record in the sense of the common law or not, are declared by the statute to constitute a record, and are intended to be a perpetual memorial and testimony of the proceedings of the Board.

It is the duty of the Board to meet at its usual place of meeting on the first Monday after the election for the purpose of counting the returns (Political Code, sec. 1278); and they must then and there proceed to make the required canvass, (sec. 1280) and publicly declare the result (sec. 1281). The Clerk must thereupon enter upon the records a statement of the declared result, (sec. 1282) and " as soon as the statement of the vote of his county at such election is made out and entered on the records of the Board of Supervisors, the Clerk must make a certified abstract of so much thereof as relates to the vote given for persons for Representatives to Congress " (sec. 1344);

and "must seal up such abstract, indorse it 'Congressional election returns,' and without delay transmit it by mail to the Secretary of State" (sec. 1345); and it thereupon becomes the duty of the Secretary of State "to compare and estimate the votes given for such Representatives, and certify to the Governor the person having the highest number of votes in each Congressional District as duly elected" (sec. 1346).

I repeat, therefore, that had the petition set forth only the fact that in making the estimate and comparison of the vote cast in the County of Monterey for the office of Representative in Congress from the Fourth Congressional District, the Secretary of State refused to consider the abstract of November 15th as the basis of such estimate and comparison, the writ of *mandamus* must have issued to compel him to perform that duty. It was observed by Chief Justice Marshall in *Marbury* v. *Madison*, (1 Cranch, 137) that the propriety or impropriety of issuing the writ is determined "*by the nature of the thing to be done.*" If the duty to be performed is ministerial—if it be peremptory or mandatory in its nature—if the officer to whom its performance has been intrusted is not vested with discretion concerning the act to be done, and if the petitioner has a direct interest in its performance, a writ of *mandamus* will lie. This may be stated as the general result of the authorities on the subject, and, tested by this rule, I think it must be conceded that, had the return of November 15th been the only one before the Secretary, it could not have been said that he was invested with discretion to put it aside, or disregard it in making the estimate and comparison required by the statute at his hands.

2. But the "certified abstract" of November 15th, though constituting the only return by the County Clerk of Monterey County authorized or contemplated by the statutes already referred to, is not the only communication claimed to be official had by that officer with the Secretary of State concerning the election held in Monterey County November last for a Representative in Congress from the Fourth Congressional District, for on the fourth day of December following, the Clerk forwarded to the Secretary of State a certificate signed by him as Clerk, and with his seal of office attached thereto, in which cer-

tificate he details the order of business pursued by the Board of Supervisors of Monterey County in canvassing the vote. In this last named certificate it is set forth that Mr. Blakenship, a member of the Board, its Chairman *pro tem.*, opened the several envelopes containing the tally-lists, and handed them one after another to Mr. Gordon, also a member of the Board, to count, and that the latter gentleman thereupon read aloud the votes received by such candidate as shown on the tally-list, and thereupon such vote was noted in pencil by the Clerk in the form of a tabulated statement; and that two other gentlemen, Messrs. Scott and Carter, were also present, keeping an account of so much of the vote so read aloud by Mr. Gordon as related to Representatives in Congress. After the entire vote of the county had thus been gone over upon the tally-lists, as read by Mr. Gordon, the Board directed the Clerk to "foot up the vote as the same appeared on the tabulated statement kept by said Clerk"; and after this had been done the Board adjourned *sine die*. The certificate proceeds to state, that at the time of the adjournment the tabulated statement, in pencil, which had been kept by the Clerk in the presence of the Board, exhibited the vote of Wigginton at the Precinct of San Lorenzo as being twenty-nine, and his vote in the entire County of Monterey as being nine hundred and eighty-eight. The certificate then further proceeds to state, that about one hour after the adjournment of the Board, and before the tabulated pencil statement of the Clerk had been transcribed into its record book, Mr. St. John, another member of the Board, stated to the Clerk that he thought a mistake had occurred in counting the vote for Representative in Congress, and that according to the count kept by Scott and Carter, Wigginton had received in Monterey County only nine hundred and eighty-six votes. St. John and the Clerk then looked over the statement kept by the latter, but at that time discovered no mistake in it, and in this condition of things the Clerk then "wrote up the minutes and transcribed the statement made in pencil to the minute-book." On the next morning, however, it was discovered by the Clerk and others, upon reference to the tally-list from the Precinct of San Lorenzo, that Wigginton had received at that precinct only

twenty-seven votes instead of twenty-nine, which had been set down for him in the tabulated statement in pencil, then already transcribed into the record-book of the Board; and the Clerk then changed the entry in the book from twenty-nine to twenty-seven, as representing the vote of Wigginton at the San Lorenzo Precinct, and from nine hundred and eighty-eight to nine hundred and eighty-six, as representing his vote in the County of Monterey; and after this change had been made, the Chairman *pro tem.*, Mr. Blankenship, signed the minutes of the Board. (*b*) On the eighth day of December, the Clerk of the County of Monterey forwarded to the Secretary of State a *third* certificate or return, bearing date of that day, purporting to certify to that officer an abstract of the record of the Board, not as the same then existed, but as he recollected it to have existed on the night of the 13th and morning of the 14th of November— that is to say, between the time of the entry of the tabulated statement in the minutes and the discovery of the mistake in counting the vote for Wigginton at the San Lorenzo Precinct.

By this abstract, based upon the mere personal recollection of the Clerk, as to the state of the record as it existed between the evening of the 13th and the morning of the 14th of November, it appeared that Wigginton had received as many as twenty-nine (29) votes at San Lorenzo Precinct, and nine hundred and eighty-eight (988) votes in the County of Monterey. (*c*)

The effect, if any, in point of law, to be attributed to this last mentioned certificate, bearing date December 8th, is the precise question in controversy here. Upon this point the allegation of the petition is as follows:

" But that, although the regular statement and return made by said Clerk on the 15th day of November, 1876, and delivered to said respondent on the 17th day of the same month, was true and correct, made in the form prescribed by law, and actually represented the vote cast in said county for your petitioner, and said Wigginton as candidates for Congress, yet said respondent now threatens to make, and publicly declares that he will make up his estimate of the vote cast in said county for this petitioner and said P. D. Wigginton in part from said pretended and false return made on the 8th day of December, 1876."

The demurrer to the petition which we are now considering admits this allegation to be true, and we are therefore led to inquire of the authority of the Secretary to substitute the certificate of December 8th for the certified abstract of November 15th.

- The "certified abstract" is admittedly official in its character; it was prepared and forwarded by the Clerk, in time, manner, and form as required by the statute. It was based upon the record, or what purported to be the record of the Board. It was an abstract of an official entry made by the Clerk in the book of records of the Board, and was based upon the written memorial preserved in and forming part of the archives of the County of Monterey, prepared and kept by a public officer, acting under the sanction of his official oath, and authorized by law to perform those functions; and these archives are intended to serve as evidence of what was said and done by the Board at the time and upon the subject to which they refer. Unless they can be relied upon for that purpose, they are of no value for any purpose, and had as well remained unwritten. It is indeed difficult to see why the statute has so industriously and in such detail provided for their preparation and custody, if they are to be by mere suggestion impeached, and a statement, extra-official in its character, substituted in their stead. For there can be no doubt that the certificate of December 8th, though signed by the person who is the Clerk of Monterey County, and attested by his seal of office, is *extra-official.*

Certainly there is no law, statutory or otherwise, which is supposed to authorize the making of such a certificate as that by the Clerk, and there is none that authorizes the Secretary of State to receive it or file it, much less to consider it and set it up against the certified abstract forwarded to him pursuant to the statute.

The so-called certificate of December 8th, being extra-official, has, therefore, no sanctity; its value is precisely that of the certificate or written statement of any other respectable gentleman, who, professing to be personally cognizant of what had transpired when the canvass was made by the Board, might have addressed a letter to the Secretary of State, assuming to detail events as he remembered them to have happened.

Upon this view there can be no question made before the Secretary, nor before us, as to what in this case constitutes the record of the Board of Supervisors, remaining in the hands of its Clerk. The argument which denies to the Clerk the power to alter or amend the records in his possession becomes merely abstract, since (the certificate of the 8th of December being out of the case) there is nothing to show that he, in point of fact, assumed to do so.

Upon *quo warranto*, or upon information in the nature of *quo warranto*, upon a contest had pursuant to the provisions of the statute of the State, or before the House of Representatives of the United States, under its constitutional power to judge of the election and qualifications of its members, this and kindred questions may be examined and correctly determined, for there would be jurisdiction to entertain the inquiry, and, what is of much importance in ascertaining the fact, the power to summon witnesses and enforce the production of testimony, upon notice given to the parties in interest, who might appear in person and by counsel.

But how is the Secretary of State to entertain such an inquiry? What statute authorizes him to hold pleas in such a matter? Where is his authority to cite the parties in interest, or the procedure to compel the attendance of witnesses—indeed any, the slightest means afforded him to conduct an investigation such as that here attempted? There is none, and he must determine the question, if at all, only as it is here contended that he may in his discretion determine it, upon an *extra-official* certificate, given *ex parte*, without the sanction of an oath, official, or of any other character, and without the authority to summon the parties in interest for any purpose, even to hear judgment.

Without now pursuing the argument further, I have arrived at the conclusions:

1st. That the only return from the County of Monterey rightfully before the Secretary of State is the certified abstract of November 15th.

2nd. That in estimating and comparing the vote given in said County of Monterey for Representative in Congress from the

Fourth Congressional District, the Secretary must proceed only upon that abstract.

And that the demurrer to the petition be overruled.

(*a*)  This abstract is as follows:

"Abstract of statement of vote of Monterey County, California, polled at the election held November 7th, A. D. 1876, relating to votes for persons for Representative to Congress.  (Political Code, sections 1344 and 1345.)

| ELECTION PRECINCTS. | REPRESENTATIVES TO CONGRESS. | |
|---|---|---|
| | P. D. Wigginton. | R. Pacheco. |
| Blanco...................... | 53 | 12 |
| Castroville .................. | 93 | 119 |
| Cholame ..................... | 24 | 12 |
| Chualar...................... | 30 | 19 |
| Gonzales..................... | 70 | 39 |
| Monterey ................... | 68 | 250 |
| Natividad .................... | 42 | 16 |
| Pajaro ...................... | 79 | 67 |
| Peach Tree .................. | 19 | 28 |
| Salinas, No. 1................ | 198 | 204 |
| Salinas, No. 2................ | 113 | 156 |
| San Antonio.................. | 26 | 54 |
| San Lorenzo.................. | 27 | 51 |
| Santa Rita................... | 39 | 24 |
| Slack's Canyon............... | 20 | 13 |
| Soledad...................... | 17 | 25 |
| Soledad Station .............. | 23 | 31 |
| Sur ........................ | 5 | 13 |
| Toro ....................... | 34 | 67 |
| Tularcitos ................... | 6 | 8 |
| Total .................. | 986 | 1,208 |

"  STATE OF CALIFORNIA,  ⎰
         County of Monterey, ⎱ ss.

   "I, John Markley, County Clerk of said county, do hereby certify the foregoing to be a full, true, and correct abstract of

the statement of the vote of said county, polled at the election held November 7th, A. D. 1876, so far as the same relates to the vote given for persons for Representatives to Congress, as said statement appears entered in the records of the proceedings of the Board of Supervisors of said county now in my custody.

" [SEAL.]  Witness my hand and official seal this 15th day of November, A. D. 1876.            JOHN MARKLEY, Clerk.

"(Endorsed) Returns of election for Representative to Congress, Monterey County.  Filed the 17th day of November, A. D. 1876.            THOMAS BECK, Secretary of State.
            " By W. A. BECK, Deputy."

(b) The following is the certificate of December 4th, 1876 :

" I, John Markley, County Clerk of Monterey County, and ex-officio Clerk of the Board of Supervisors of said county, do hereby certify as follows, to wit : That on the 13th day of November, 1876, the Board of Supervisors of said county met at their usual place of meeting, in the office of the County Clerk of said county, to canvass the vote polled in said county on the 7th day of November, A. D. 1876.  That there were present at said meeting Supervisors Edwin St. John, S. B. Gordon, and A. J. Blankenship.  The Board organized · by electing Mr. Blankenship Chairman pro tem. of said meeting.  The Board proceeded to canvass the vote, Mr. Blankenship opening the large envelopes containing a copy of the Great Register, poll list, and tally list, and handing to Mr. Gordon the tally list. Mr. Gordon read out the vote received by each person, and as said vote was read out by Mr. Gordon, the Clerk or his deputy took down the same with a lead pencil in a tabulated statement prepared for that purpose.  At the same time John B. Scott, County Auditor, and L. P. Carter kept an account of so much of said vote as related to member of Congress, as the same was read out by Mr. Gordon.

" After the Board had opened all the envelopes and counted all the votes as per the tally list therein contained, they directed the Clerk to foot up the foot as the same appeared on the tabulated statement kept by said Clerk.  After footing up the same

and ascertaining the result of the vote on county officers, after passing an order declaring the county officers receiving the highest number of votes for the office which they had been voted duly elected, directing the Clerk to issue the proper certificates to them, the Board adjourned *sine die.* At the time the Board adjourned as aforesaid, the vote stood on the tabulated statement kept by the said Clerk at San Lorenzo Precinct, P. D. Wigginton 29, and for the said P. D. Wigginton in the county, 988. That about one hour after the adjournment of said Board, and before the pencil minutes and tabulated statement kept by the Clerk had been transcribed to the minutes of said Board, Mr. St. John, a member of said Board, returned to the office and stated to me that he thought a mistake had been made in the vote for Congressman, that Mr. Scott and Mr. Carter only had 986 votes for Mr. Wigginton. We looked over the figures which I had made and found that they had been added correctly. I then gave to Mr. St. John a copy of my figures of the vote for Congressman, and suggested to him that he compare the same with the figures of the vote, as the same had been kept by Mr. Scott, and said that he would in that way find out where or in which precinct the difference was, and if there was a mistake we would correct it in the morning. After supper that night I wrote up the minutes and transcribed the statement made in pencil to the minute book. On the morning of November 14th, Mr. J. W. Leigh and myself were in the Clerk's office. Mr. St. John came in and stated to me that the difference in the figures was in San Lorenzo Precinct. I got the tally list from San Lorenzo Precinct, and Mr. St. John, Mr. Leigh, and myself examined the same. We found that Mr. Wigginton had only received 27 votes, whereas the tabulated statements and the minutes as they stood then had allotted to Mr. Wigginton 29 votes in said precinct. The tally list was in all respects regular. The 27 was in marks, in figures twice, and written twice. We all three felt fully convinced that Mr. Wigginton had received at the precinct only 27 votes, and the Clerk had made a mistake in putting down 29. I then and there changed the vote as entered on the minutes from 29 to 27, and the total vote from 988 to 986, and thereafter, and on the same

day, the Chairman of said Board signed the minutes. That on or about the 15th day of November, 1876, I made an abstract of statement of so much of said vote as related to persons voted for Representatives to Congress, and duly certified the same to the Secretary of State of California; that said statement, so certified as aforesaid, only gave Mr. Wigginton 27 votes in said San Lorenzo Precinct, and only gave him 986 in the county; that the minutes of said Board in relation to said vote have not been changed since the same were signed by the Chairman as aforesaid; that said minutes had not been changed since I made and forwarded the abstract as aforesaid; that the minutes of said Board now show 27 votes in San Lorenzo Precinct, and 986 votes in the county for Mr. Wigginton; and that said abstract of statement so forwarded as aforesaid contains a full, true, and correct statement of the vote for Representative to Congress, as the same appears entered on the records of said Board of Supervisors at the present time.          JOHN MARKLEY,

" [SEAL.]                    County Clerk Monterey County.

" (Endorsed) Filed December 4th, 1876.

"THOMAS BECK, Secretary of State.

" By WM. A. BECK, Deputy."


(*c*) The following is a copy of the certificate of December 8th, 1876:

"MONDAY, November 13th, 1876.

" At 10 o'clock A. M., the Board of Supervisors of Monterey County met at their usual place of meeting, for the purpose of canvassing the returns heretofore filed in the County Clerk of said county's office, from the several precincts in said county, of the presidential election held on the 7th day of November, 1876. Present—Supervisors Edwin St. John, J. A. Blankenship and S. B. Gordon and the Clerk.

" On motion, Mr. Blankenship was appointed Chairman of said Board *pro tem.*

" It appearing to the Board that the returns from each and every precinct in this county have been received by the said County Clerk, said Board proceeded to canvass said returns in public, and as directed by law. In the following tabulated statement the

first column on the left shows the office to be filled, which each person was voted for; the second column shows the names of the persons voted for. Each column from the third to the twenty-second inclusive, shows the number of votes given in the precincts named at the top of the respective columns to each person voted for; the last column, or that on the extreme right, shows the total number of votes given in the county for such person:

"PRECINCTS.

| Office to fill which each person was voted for. | Persons voted for | Blanco. | Castroville. | Chualar. | Chulame. | Gonzales. | Monterey. | Natividad. | Pajaro. | Peach Tree. | Salinas No. 1. | Salinas No. 2. | San Antonio. | San Lorenzo. | Santa Rita. | Slack's Canyon. | Soledad. | Sur. | Soledad Station. | Toro. | Tularcito. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Member of Congress. | P. D. Wigginton... | 53 | 93 | 24 | 30 | 70 | 68 | 42 | 79 | 19 | 198 | 113 | 26 | 29 | 39 | 20 | 17 | 5 | 23 | 34 | 6 | 988 |
| | R. Pacheco........ | 12 | 119 | 12 | 19 | 39 | 250 | 16 | 67 | 28 | 204 | 156 | 54 | 51 | 24 | 13 | 25 | 13 | 31 | 37 | 8 | 1208 |

Monday, November 13, 1876.

"And the Board having canvassed the returns, and being fully advised in the premises, it is declared that the following-named persons having received the highest number of votes given in the county, or in the Supervisorial District, for the office for which the same is appended, said persons are declared elected to said office, and the County Clerk is directed to make out and deliver to each of such persons a certificate of election in due form.

"The Board adjourned sine die.

"Attest:  JOHN MARKLEY, Clerk."

"STATE OF CALIFORNIA, } ss.
     County of Monterey, }

"I, John Markley, County Clerk of said Monterey County, and ex-officio Clerk of the Board of Supervisors of said county, do hereby certify that the said Board adjourned about 5 P. M., Monday, November 13th, 1876. That at the time of their said adjournment the minutes were in pencil; that thereafter, and the same day, I transcribed said minutes to the minute-book of the said Board, and that the foregoing is a full, true, and correct copy of said minutes transcribed as aforesaid to said book, and as the same stood on the night of the 13th and the morning

of the 14th of November, A. D. 1876, as the same related to the canvass of the votes polled in said county November 7th, 1876. And I do further certify that the foregoing is a full, true, and correct copy of said minutes as they stand on the minute-book of said Board at this time, with the following exception, that the name of 'J. A. Blankenship,' Chairman *pro tem*, appears on said minutes, and that in the tabulated statement the vote in San Lorenzo Precinct, allotted to Mr. Wigginton, had been changed from · 29 to 27, and the vote in the column of totals, or the extreme column to the right, has been changed from 988 to 986. That as the same now stands on said minute-book to-day, Mr. Wigginton has allotted to him only 27 votes in San Lorenzo Precinct, and allotted to him only 986 votes in the County of Monterey, for member of Congress.

"Witness my hand and seal of the County Court of said County of Monterey, this 8th day of December, A. D. 1876.

"[SEAL.]        JOHN MARKLEY, Clerk as aforesaid.

"(Endorsed) Filed in the office of Secretary of State, this 11th day of December, A. D. 1876.

"THOMAS BECK, Secretary of State.
"By WM. A. BECK, Deputy."

NILES, J., concurring :

I concur in the judgment. The reasoning of the Chief Justice, and also that of Mr. Justice Rhodes, lead, by different lines, to the conclusion that the Secretary of State was bound to receive and act upon the abstract copied from the record of the Board of Supervisors as it existed when the abstract was made and certified by the Clerk.

McKINSTRY, J., concurring specially:

I agree that the demurrer should be overruled, with leave to the respondent to answer, but I dissent from the views expressed by the Chief Justice and by Mr. Justice Rhodes. As at present advised, I am not prepared to admit that the "abstract" of the County Clerk is conclusively binding upon the Secretary of State as evidence of the contents of the record of the Board of

Supervisors; or (in case of a denial on his part that it is a correct transcript) that the Court would compel him by *mandamus* — a writ in the nature of a *prerogative writ* — to proceed on a false or pretended transcript, or on a copy of a simulated record.

CROCKETT, J., dissenting:

It is conceded on all sides that, under the Political Code, the duty of canvassing the election returns of a county, and declaring the result, is confided exclusively to the Board of Supervisors, and that its action in the premises, when duly entered of record, is absolutely conclusive, except in the case of a contested election. The method of procedure in canvassing the returns and declaring the result is prescribed by the statute, and is not only perfectly simple, but is entirely free from ambiguity. The Board must convene at its usual place of meeting on a specified day, and if all the returns from each precinct in the county in which polls were opened have been received, the Board must then and there proceed to canvass the returns; but if all the returns have not been received, the canvass must be postponed from day to day until all of the returns are received, or until six postponements have been had. The canvass must be made in public, and by opening the returns and estimating the vote of such county or township for each person voted for, and for and against each proposition voted upon at such election, and declaring the result thereof (secs. 1278, 1279, 1280, and 1281). "The Clerk of the Board must, as soon as the result is declared, enter on the records of such Board a statement of such result, which statement must show: 1. The whole number of votes cast in the county. 2. The names of the persons voted for, and the propositions voted upon. 3. The office to fill which each person was voted for. 4. The number of votes given at each precinct to each of said persons, and for and against each of such propositions. 5. The number of votes given in the county to each of such persons, and for and against each of such propositions" (sec. 1282). The duty of the Clerk is purely ministerial, and consists in entering upon the records of the Board a statement of the result as *declared by the Board.* No one pre-

tends that he has any greater power, or that he has authority to enter upon the records any statement of the result different from that declared by the Board. If, in making the entry upon the record, he had a supervisory power to correct mistakes, real or fancied, made by the Board in declaring the result, he would become, practically, the canvassing officer, and the record would show, not the result as ascertained and declared by the Board, but as declared by the Clerk. It is not claimed that he has any such supervisory power. After the result, *as declared by the Board,* has been properly entered of record by the Clerk, his next duty, in respect to a general election, is prescribed by secs. 1288 and 1289, which provide, that "so soon as the statement of the vote of his county is made out and entered upon the records of the Board of Supervisors, (he) must make a certified abstract of so much thereof as relates to the votes given for persons for offices to be filled at such   *   *   *   general   *   * election," and "must seal up such abstract, indorse it ' Election returns,' and without delay transmit it by mail to the Secretary of State." It has thus been shown that the only statement of the result which the Clerk is authorized to enter upon the record is that declared by the Board, and it is a certified abstract of this statement, and none other, which he is directed to transmit to the Secretary of State. It appears, from the petition in this case, that on the 17th November, 1876, after the statement of the result of the election in Monterey County had been entered of record, and after the record had been signed by the Chairman of the Board of Supervisors and by the Clerk, the latter made out and transmitted to the Secretary of State a certified copy of the record, (which on its face is in due form) showing that at the election in Monterey County, held in November last, the petitioner received one thousand two hundred and eight votes, and his competitor, P. D. Wigginton, nine hundred and eighty-six votes, for Representative to Congress. A copy of the certified abstract referred to is annexed to and made a part of the petition, and from the tabulated statement incorporated into the abstract it appears that at San Lorenzo Precinct, in said county, the petitioner received fifty-one votes, and Wigginton twenty-seven votes. It is contended on behalf of the

petitioner, first, that after the record of the action of the Board of Supervisors in canvassing the returns and declaring the result was authenticated by the signatures of the Chairman and Clerk of the Board, it became and is the only authentic record of their proceedings, and as such, like all other records, imports absolute verity, and cannot be impeached by evidence *aliunde*, in a collateral proceeding.   Second. That the Clerk had no authority in law to make out and transmit to the Secretary of State any other certified statement or abstract than an abstract so signed and authenticated, and as it now exists.

· In support of the first point it is contended that inasmuch as the statute directs that the record of the proceedings of the Board be signed by the Chairman and Clerk, it was intended, that when so signed it should stand as the only authoritative exposition of the action of the Board, and cannot be impeached collaterally.   It may be conceded that in directing the record to be so signed, the statute intended to impart to it a greater degree of certainty than it might otherwise have had, as a correct exposition of the action of the Board; and it may be assumed that when thus signed it is *prima facie* evidence of its correctness.   But it has been uniformly held, so far as I am aware, that such statutes are directory only, and that a failure to comply with them does not of itself invalidate the record. In Wisconsin there was a statute directing the Judge to sign the record at the end of each day's proceedings; and in *Eastman* v. *Harteau*, 12 Wis. 267, the record of a judgment was offered in evidence which had not been signed by the Judge.   It was objected to on this ground; and Dixon, C. J., in delivering the opinion of the Court, said: "There is fair reason for saying that this provision was directory, and that it was not intended that its non-observance would invalidate the judgment."   In support of this proposition numerous authorities were cited, among which are the following: *Briggs* v. *Clarke*, 7 How. (Miss.) 457; *Pendar* v. *Fells*, 2 Smedes & M. 535; *Colman* v. *McKnight*, 4 Mo. 83; *Venable* v. *McDonald*, 4 Dana, 336; *Buckmaster* v. *Carlin*, 3 Scam. 104; *Hall* v. *Law*, 2 Watts & S. 135; *Kellogg, Ex parte*, 6 Vt. 509; *Reed* v. *Sutton*, 2 Cush. 115; *Boston* v. *Weymouth*, 4 Cush. 542.   In *People* v. *Eureka*

*Lake & Y. C. Co.* 48 Cal. 143, the action was to enforce the collection of a tax levied by the Board of Supervisors, and at the trial the plaintiff offered in evidence the record of the Board levying the tax. But the record was not signed by either the Chairman or the Clerk of the Board, and it was objected to on this ground. In discussing this point, we said: " The statute does not declare that the record shall not be proof of the action of the Board, if not signed by the officers named; but the effect is only to make their signatures evidence, identifying the minutes. The failure of the Chairman and Clerk to discharge the. particular duty only imposed on the party desiring to prove the official action of the Board some additional trouble, in establishing the handwriting of the entries, their contemporaneous character, and the official custody from which the book was produced." This was a distinct adjudication that the signatures of those officers were not essential to the validity of the record as such, and that the only effect of the omission was to impose upon the party relying on the record the necessity for some additional proof as to its authenticity. I conclude, therefore, that the record of the Board, if otherwise correct, is none the less a record, because not signed by the Chairman and Clerk; and this brings us to the question whether the Clerk had any authority in law in making the abstract to be transmitted to the Secretary of State, to make any other certified statement or abstract than one taken from the record as required °by the Chairman and Clerk. If he has not, the inevitable result must be that though the record, as originally made up, was in all respects correct, and contained a true and accurate statement of the action of the Board in canvassing the returns and declaring the result; yet, if it was afterward altered or interpolated, through fraud or mistake, before it was signed by the Chairman and Clerk, the abstract must nevertheless be made from the false and simulated record, though the Clerk may have before him the most conclusive proofs of the fraudulent or unauthorized alteration, and even though the record, on its face, discloses the fraud or unauthorized interpolation. But I cannot assent to this proposition.

When the Clerk, in the performance of his duty, transcribed

into the proper record-book the action of the Board in canvassing the returns and declaring the result, the presumption of law is that he properly performed his duty, and that the record so made contained a true and accurate statement of the action of the Board.   From that time it became and was a *record* in the sense of the statute, though not signed by the Chairman and Clerk, or either of them.   If it was afterwards altered in a material part through fraud or mistake, either before or after it was signed by the Chairman and Clerk, the alteration must be rejected as forming no part of the record, which must be read as though the alteration had not been made.   It will scarcely be claimed that if there was an unauthorized change in the record in a material part *after* it was signed by the Chairman and Clerk, the latter, in making up his abstract, would be bound by the alteration, or that he might not reject that part of it which was spurious, and which for that reason formed no part of the record ; and if the signatures were not essential to the validity of the record as such, I do not see on what ground it can be held that the Clerk is concluded by a spurious alteration of the record, made *before* it was signed.   Whether made before or after the signature, the unauthorized alteration formed no part of the record.   If the original record is destroyed by accident or design (as by fire, or by fraudulently cutting out and abstracting the leaves containing the entries) there would, of course, be no record *in esse* from which the Clerk could make the abstract required by sec. 1288.   In like manner if the record be so mutilated by unauthorized erasures and interlineations that it is impracticable to distinguish the true from the false, it would be practically destroyed, and no valid record would remain from which the abstract could be made.   In such cases the Clerk would be disabled from performing the duty enjoined upon him by sec. 1288.   It is said, however, that it would be intrusting a dangerous power to the Clerk, if he has authority, at his discretion, to reject such parts of the record as he shall decide to be spurious.   The answer to this suggestion is, that all power must be lodged somewhere, and it is always liable to abuse.   The Chairman of the Board and the Clerk might fraudulently and by collusion make up a false record, and on the

theory advanced on behalf of the petitioner, such a record, when signed by the Chairman and Clerk, would import absolute verity, and could not be attacked collaterally. The danger from such a fraud might be somewhat less in degree than from a fraud perpetrated by the Clerk alone; but it would be only less in degree, and not different in quality.

The petition further shows that on the 11th day of December, 1876, the Clerk filed with the Secretary of State another paper, purporting to be a certified copy of the minutes of the Board of Supervisors, in canvassing the election returns and declaring the result thereof; from which it appears that the Board declared that at San Lorenzo Precinct Wigginton received twenty-nine and Pacheco fifty-one votes. Appended to this paper is a certificate of the Clerk, to the effect that, when the Board adjourned after canvassing the returns and declaring the result, the minutes were in pencil, and that after the adjournment, and on the same day, the Clerk correctly transcribed the minutes into the minute-book of the Board, and that the said minutes as originally transcribed into the book yet remain in said book, except that the name of the Chairman of the Board has since been appended to said record, and except also that, since the original entry in the record, the tabulated statement of the vote at San Lorenzo Precinct has been changed, so as to allot to Wigginton only twenty-seven instead of twenty-nine votes at that precinct, and the column of totals has been changed so as to reduce Wigginton's vote in the county from nine hundred and eighty-eight to nine hundred and eighty-six. It further appears from the petition that on the 4th day of December, 1876, the said Clerk filed with the Secretary of State another statement or certificate, detailing the circumstances under which the alteration in the record was made. From this document it appears that, after the returns were canvassed, and the result declared by the Board, awarding to Wigginton twenty-nine votes at San Lorenzo Precinct, and nine hundred and eighty-eight votes in the county, and after the minutes stating this result had been correctly transcribed by the Clerk into the minute-book of the Board, but before the minutes were signed by the Chairman, the Clerk became convinced that Wigginton had received only

twenty-seven votes instead of twenty-nine at San Lorenzo Precinct, and only nine hundred and eighty-six instead of nine hundred and eighty-eight votes in the county, and thereupon he altered the tabulated statement on the record accordingly, so as to make the result conform to the true vote, as he understood it, thereby allotting to Wigginton on the record as changed two votes less than were awarded to him by the Board of Supervisors. In respect to these documents, it is contended by counsel, first, that when the Clerk transmitted to the Secretary of State the certified abstract of November 17th, (which was in due form) his power in the premises was exhausted, and he had no authority in law to transmit another and a different certificate; 2nd, if he had that power, these papers are not and do not purport to be certified abstracts from the record of the Board, or from any record, but are only *ex parte* statements, reciting certain transactions, resting partially in parol, and which cannot be considered as in any manner affecting the duty of the Secretary of State in counting the vote. In the view I take of the case I deem it unnecessary to consider the first point, and before proceeding to the second, it is to be observed, *in limine*, that the petition does not question the truth of the *facts* stated in the Clerk's certificates of December 4th and December 8th, but denies that they are of any legal significance, or are entitled to be in any manner considered by the Secretary of State in the performance of his duty, or by this Court in determining whether a peremptory writ of mandate ought to issue. For the purposes of this decision, the *facts* stated in the documents referred to, not being denied, must be assumed to be true; and the point to be determined is, whether they have any legal significance or are entitled to be considered for any purpose material to this inquiry. The case as made by the petition may be briefly stated as follows: That at San Lorenzo Precinct, Wigginton received only twenty-seven votes, and nine hundred and eighty-six votes in the county; but in canvassing the returns the Board of Supervisors erroneously allotted to him twenty-nine votes at that precinct, and nine hundred and eighty-eight votes in the county; that the result, as declared by the

Board, was duly and properly transcribed into their minute book and signed by the Clerk; that the Clerk, having discovered the mistake made by the Board, altered the record so as to make it conform to the actual vote cast, which was different from that declared by the Board in the particular referred to; that after the alteration, the Chairman of the Board signed the record as altered; that thereupon the Clerk made a certified abstract from the record as altered and transmitted it to the Secretary of State; but subsequently transmitted to him a written statement setting forth substantially the foregoing facts, which we assume to be true. On these facts the petitioner asks for a peremptory writ of mandate to compel the Secretary of State to count the vote, not as it was declared by the Board of Supervisors, but as shown by the altered record, which was changed in a material part without the authority of law. It is perhaps unnecessary for us to decide to what extent, if at all, or in what cases, if any, the Secretary of State may question the validity of a certified abstract, which, on its face, is in due form of law. That he may inquire into the fact whether the certificate is genuine and signed by the proper officer, no one, I presume, will deny; and it would appear to be equally clear, that though the certificate is in due form, he may inquire whether it is founded upon a record which, though originally valid, and made up and signed in due form, was afterward altered in material parts without authority of law. But whatever may be the extent of his discretion, if any, in that class of cases, I think this is not a proper case for *mandamus* on the facts disclosed by the petition. It is a prerogative writ, and does not issue *ex debito justiciæ*. If it affirmatively appears that the act to be performed will work an injustice, or contravene good morals, or result in a public or private wrong, the Court will decline to issue the writ. If, for example, it had appeared on the face of this petition that Wigginton secured a majority of votes in Monterey County, and that the result was truly declared by the Board of Supervisors, but the Clerk and Chairman of the Board had fraudulently combined to make up a false record, which on its face showed a majority for the petitioner, and that the Clerk had made a certified abstract in due form founded on the false and fraudulent

record, which the Secretary of State refused to act upon on being informed of the fraud, it will scarcely be claimed that in such a case the Court would compel him by *mandamus* to consummate the fraud.

The same result would follow if it appeared that the true record had been altered in a material part, without the authority of law, through mistake or inadvertence, so as to make it speak a falsehood. In such a case, the answer to an application for a *mandamus* would be that the writ is intended to prevent a failure of justice, and cannot be used to perpetuate a wrong, or to compel the performance of an act, the result of which would contravene public policy, or violate good morals. In this State, the policy of the law, as expressed in the statute, is to confide to the Board of Supervisors the exclusive authority to canvass the election returns of a county and declare the result, and its action in the premises, when in due form and free from fraud, is absolutely conclusive on all persons whomsoever, except in the case of a contested election. We are asked, in this case, to compel the Secretary of State, by a peremptory writ, to estimate and count the vote in accordance with a certificate of the Clerk, which, as appears on the face of the petition, states a result not only not declared by the Board, but essentially different from that which was declared, and which was duly transcribed into the record. To award the writ under these circumstances would be to contravene the plain policy of the law, which confides to the Board the exclusive authority to declare the result of an election, and which has not intrusted to the Clerk any supervisory power over the Board in correcting its mistakes or otherwise. Nor is it material to inquire whether the Board, in fact, committed the mistake imputed to it, and whether the record, as changed by the Clerk, states the true result of the election. Having no authority to declare the result, or to correct any mistakes of the Board, the attempt of the Clerk to do so was simply a nullity; and to award the writ as prayed for would be virtually to decide that the result, as declared by the Clerk, was valid and obligatory, notwithstanding the statute explicitly provides that the authority to canvass the returns and declare the result is confided exclusively to the Board. If a

practice of that kind were tolerated, it would necessarily involve an inquiry whether the result as declared by the Board, or that declared by the Clerk, was the true result of the election ; and that, too, though it is conceded on all sides that the Clerk has no authority in the premises. In determining whether the writ ought to issue, it is our duty to uphold the plain policy of the law, which provides that the result, as declared by the Board, shall be absolutely conclusive, except in the case of a contested election. To issue the writ as prayed for would be to contravene this policy by compelling the Secretary of State to accept and act upon a certificate of the Clerk which does not state the result as declared by the Board, but a different result declared by the Clerk. For these reasons, I am of opinion that the writ should be denied.

After the foregoing opinions had been delivered, and on the 16th day of April, 1877, the respondent, Beck, filed an answer to the petition, in which he admitted that before the 28th day of January, 1876, he had received the official returns of the vote cast for Representative in Congress from the Fourth Congressional District, but denied, on information and belief, that all the returns received by him were official and correct ; denied, on information and belief based upon the true election returns received from all the counties in the district, that Pacheco received the highest number of votes, or that he received a majority of one vote; admitted that about the 17th of November, 1876, he received from John Markley a paper purporting to be a certified copy of the official vote of Monterey County, cast for Representative in Congress ; denied, on information and belief, that said paper contained a true and correct return of the votes cast for said Representative in said county ; alleged that the total number of votes represented in said paper to have been cast for Pacheco was one thousand two hundred and eight, and for Wigginton was nine hundred and eighty-six; alleged, on information and belief, that the true number of votes cast for Wigginton was nine hundred and eighty-eight; denied that he ever admitted the return of votes cast in Monterey County made to him by Markley on the 17th day of November, 1876,

were the only correct returns; alleged, on information and belief, that the return made by Markley on the 8th day of December, 1876, contained a true and correct statement of the votes cast for Pacheco and Wigginton; denied that said last named return did not form a part of the record of the Board of Supervisors; denied that the number of votes cast in the San Lorenzo Precinct was, for Pacheco fifty-one, and for Wigginton twenty-seven; alleged, on information and belief, that the true number of votes cast in said precinct was, for Pacheco fifty-one, and for Wigginton twenty-nine, and that the Board of Supervisors had declared such to be the result; denied, on information and belief, that Wigginton only received nineteen thousand one hundred and three votes, and alleged that he received nineteen thousand one hundred and five votes; alleged that the return made by Markley on the 17th of November, 1876, was false, fraudulent, and manufactured; alleged that when the Board of Supervisors met to canvass the vote that they ascertained and declared that Pacheco had received 51 votes in the San Lorenzo Precinct, and that Wigginton had received 29 votes, and had received in the county 988 votes, and that this declaration was immediately entered in the records of the Board of Supervisors, and that in making the return of November 17th, Markley acted without power or authority and in violation of the statute, and said return was false, fraudulent, and manufactured. The answer also raised an issue as to an alleged demand made by Pacheco on the respondent to proceed and count the vote upon the return made on the 17th of November, and certify the result to the Governor. The petitioner moved for judgment on the pleadings, and on said motion the following opinion was delivered:

By the Court, WALLACE, C. J.:

Upon all questions sought to be raised by the answer, (that of due demand having been abandoned at the argument) the views heretofore expressed by us conclude the respondent.

Let a peremptory writ of *mandamus* issue in accordance with the prayer of the petition.

McKINSTRY, J., dissenting:

I respectfully dissent from the judgment. When this case was submitted on demurrer to the petition, I said: "As at present advised, I am not prepared to admit that the 'abstract' of the County Clerk is conclusively binding upon the Secretary of State as evidence of the contents of the record of the Board of Supervisors; or (in case of a denial on his part that it is a correct transcript) that the Court would compel him by *mandamus*—a writ in the nature of a *prerogative writ*—to proceed on a false or pretended transcript, or on a copy of a simulated record."

The case has now been submitted on motion for judgment, notwithstanding an answer which denies that the "abstract" is correct, and avers that the record has been altered, without authority, in the very particular on which the petition for the writ is based. I cannot assent to the order granting this motion, because such order involves a decision by this Court that the writ of mandate (which should never issue when the Court, in the exercise of a legal discretion, can see that positive injustice may be done) may be resorted to for the purpose of compelling the Secretary of State to proceed on a forged or on a pretended copy of the real record.

The "certified abstract" mentioned in sec. 1344 of the Political Code, and which the Clerk of the Board is required to transmit to the Secretary of State, is not, and does not purport to be, the primary evidence of the "declaration" of the Supervisors in regard to votes cast in the county. In this respect it differs from the original "return," signed by the Judges of Election, and which, from the nature of the case, is the only evidence to which the Supervisors can refer in order to ascertain the votes cast at the precinct.

The certified "abstract" only purports to be a *copy* of a portion of the record of the Board of Supervisors. Like the certified copy of a registered deed, it is *prima facie* evidence; but, in my opinion, it does not control the Secretary in the particulars wherein it departs from the record.

It has been suggested, on the one hand, that the alteration by the Clerk made the record accord with the Judges' return from

the disputed precinct; and has been asserted, on the other, that the return, as well as the record, was altered. This inquiry, however, cannot be material. If the Clerk's certificate is conclusive where the alteration in the record is such as makes it what it should have been if the Supervisors had correctly declared the result, it is equally conclusive upon the Secretary, if he shall change the record, when the result has·been *properly declared and recorded.*

For convenience, the several County Clerks are directed to send to the Secretary of State a copy of the record, instead of the record itself. But, in view of the duties—simply clerical—imposed on the County Clerk, it may well be said that, in contemplation of law, the estimate of the Secretary is based on the records of the Supervisors. To make the return of the Clerk evidence—not to be contradicted—of the declaration of the Board, is to recognize in that officer, whose duties are those of a mere scribe, the power of canvassing the votes and declaring the result of an election in his county.

It has been urged that the duty of the Clerk is simply to make an abstract of the record as the record reads *when the abstract is made,* and that the Secretary of State must accept such abstract as correctly setting forth the record. If this were so, the Clerk would be precluded—even in case of a fraudulent or felonious alteration of the record after it had been signed both by the Clerk and Chairman of the Board—from certifying to the alteration, or to a transcript of the record as it was or should be in truth and fact, or from refusing to certify on the ground that there was no existing record. Yet it is manifest that such fraudulent or felonious alteration would constitute no portion of the record. Could *mandamus* be resorted to as a means of compelling the Secretary of State to act upon a copy of the record as it was after it had thus been fraudulently and feloniously altered?

Nor could it be claimed, in case of such fraudulent alteration after the signing, that the Chairman and Clerk had adopted the matter fraudulently inserted, by permitting their names to remain on the book; their signatures would have been appended to the real record—that is, the record before the alteration—and they would not be authorized to remove them. In such

case, if the record could be read as it was before the over-writing, *that* would be the record. (*People* v. *Granice*, 50 Cal. 447.) If a portion of the original matter were entirely erased, in every action or proceeding before a *Court*, the original matter could be proved by oral testimony, and the record would be read as it stood before the erasure. It may be that the Clerk, in making the statutory certificate, would not be authorized to supply the original matter from his memory, but he certainly should reject the words inserted without authority, because those words *would constitute no part of the record.*

If the record had never been signed by the Chairman and Clerk, it would have been none the less a record. (*People* v. *Eureka Lake Water Company*, 48 Cal. 143.)

It has been said, however, that although the failure to sign does not invalidate the record, yet when they *are* affixed, the signatures conclusively establish the verity of the minutes so signed; that all variations or changes in the writing previously made, like the oral conversations which may precede a written contract, are merged in the writing actually signed. But when it is admitted that there is a record before or without the signatures, the effect claimed to be produced (if it is produced) by the signing, to wit, the preclusion from any inquiry as to what was the record before the signing, can be produced only by the signatures of *both* the officers: since the statute directs the Chairman as well as the Clerk to sign.

As has been shown, an alteration in the minutes, made after both have signed, would not necessarily constitute any part of the record. The theory, therefore, of those asserting the conclusive effect of the signatures must be that the attestation of the Clerk and Chairman conclusively proves the record as it stands *when the signatures are subscribed.* But this conclusive effect, if produced at all, is created by the signatures of both, and the benefit of the supposed conclusive presumption can no more be claimed for matter inserted after one has signed, than for matter inserted after both have signed. As to such matter, he who signed before its insertion has never certified to its correctness in such manner as to create the conclusive presumption.

It may be said that it would be a vain act for the Clerk again

to sign after the change, and that the very making of the change itself should be construed to be a renewal of the signature. In the case of a private agreement, and for ordinary purposes—the alteration being made with the assent of all parties—this would be true.

But it must be remembered that the really *important question* here (if it can be reached) is—what was the " declaration " of the Supervisors in respect to the vote? The claim of counsel for petitioner is that the Secretary of State is estopped from ascertaining that declaration by reason of the presence of the names of the chairman and clerk: in other words, it is claimed that respondent and this Court—by reason of a technical rule deriving its force from the conclusive presumption created by the signatures—are prohibited from inquiring in respect to the declaration of the Board as recorded by the Clerk in the discharge of his proper clerical function, and must accept as absolutely correct a record of the Clerk's own judgment as an assumed canvasser.

When a party appeals to such a rule of estoppel he may very properly be required to bring his case clearly within the rule.

As the case is now presented, it must be assumed that the averments of the answer are true. What, then, is the record?

It would seem the answer must be that it consists of the original entries in the minute-book—that which stood there when the task of entering the statement, which the statute requires the Clerk to enter " as soon as the result is declared," was completed.

It would perhaps be difficult in some cases to determine when the record was completed. Having written a statement, the Clerk would be competent at the same sitting, and probably within a reasonable time afterward, to correct an error or to amend an imperfect statement, so as to make it accord with the actual declaration of the Board, and a court would not seize upon a merely temporary *suspension* from his labor and hold such to be a final cessation. Perhaps no definite period of time could be fixed which would of itself establish that the work was finished, but all changes must be made by the Clerk while his clerical task of entering the declaration of the Board is *in fieri.*

I cannot believe that when his task of entering the declaration of the Board.had been finished, and after the lapse of time, however inconsiderable, the Clerk can initiate an independent inquiry, not in respect to what the Supervisors declared when they canvassed the vote, but avowedly in respect to what *they ought to have declared*, and then alter the minutes which contain the real declaration, so that they shall accord with his own notions of a correct declaration of the vote. After such alteration the writing would not constitute a record of the proceedings of the Board, but of the judgment of the Clerk. The Clerk has no *power* to transmit to the Secretary any other paper than a copy of the proceedings of the Board. The statute does not make the Clerk a canvasser. He is the mere scribe, whose office is performed when he makes record of the determination of the Board and transmits a copy of such record to the Secretary of State. If the allegations of the answer are correct, the Clerk did not confine himself to his proper duties, but assumed to discharge those imposed by law upon the Board of Supervisors, and that, too, after they had performed those duties—thus arrogating the power to reverse the decision of the proper canvassing officers.

Mr. Justice CROCKETT did not express an opinion.