## The People on the relation of The County of Houghton v. The Commissioner of the State Land Office.

*Statute construed.* The fourth section of the act of March 20, 1863 (*Sess. L., 1863, p. 417*), was intended to give to the respective counties, in said act referred to, the right to make selection of lands to be withheld from sale, according to the conditions of said act, at any time after its passage, as well before as after the work was done. But it withdrew nothing from the market until the commissioner should be notified of the selection. The time which would govern as to the right of selection would, therefore, necessarily be the time of such notice to the commissioner. If the land selected was not then excepted or reserved from the operation of the appropriation made by the act, the county would be entitled to patents for the due proportion of the lands thus selected, as each ten consecutive miles of the said road should be completed according to the provisions of said act.

*Order of selection.* The relator having made selections of lands under said act and notified the commissioner thereof by sending him a list thereof, at two different times, and these two lists containing an excess in the aggregate of the amount which the relator was entitled to so select and withhold under said act, the right of selection must be held to attach to each parcel in the order of its selection, which is the order in which the several descriptions are mentioned on said lists. And in pursuing this order, any particular tract or tracts which might have been sold before the commissioner was notified of the selection, and any tract for any cause not liable to be selected, must be entirely omitted and the list treated in all respects as if such tract or tracts had never been included among the descriptions. But the relator had no right to select or keep out of the market any more than the amount of land authorized by said act to be selected.

HOUGHTON CO. *v.* COMMISSIONER OF STATE LAND 'OFFICE.

*Rule of office not binding after departed from by officer.* It would have been a proper rule to have adopted, and would have been in harmony with the design and purpose of said act, to restrict the demand for patents under said act to the order of selection as shown by said lists. But the commissioner, upon the first demand for patents, having departed widely from any such rule in the lands to which he did issue patents, the order was thus broken and it became impracticable thereafter to observe such order of selection with reference to the selected lists ; so that either the relator or the commissioner must be allowed to select or else no further patents could be issued at all. The right to make such selection under such circumstances belongs rather to the relator than to the commissioner and the latter cannot withhold patents on the ground that the demand for them does not conform to such rule.

*The term "appropriated" defined.* The lands selected and for which patents were demanded had not been so reserved by the state as mineral lands, as not to be liable to selection under said act. The act applies to all swamp lands in the Upper Peninsula of the state "not otherwise appropriated." The term "appropriated" as here used, considered in the light of the other swamp-land legislation of the state, signifies an appropriation by the legislature for some purpose similar to that intended by this act,—a disposition of the lands in some way by which the state is to part with the title. There is nothing in the act itself to withdraw from its operation any swamp lands belonging to the state in the Upper Peninsula, whether classed as mineral lands or not.

*Act declaring legislative policy, repealable.* The act of April 25, 1846 (*Comp. L., Chap. 83*), reserving all lands known to contain mines or minerals, then, or thereafter becoming, the property of the state, from sale by the state authorities until so directed by the legislature, merely declared the policy of the legislature enacting it, and was repealable by subsequent legislation; and any subsequent act, clearly inconsistent with it, would thus far repeal it.

*Act in pari materia considered in construing a statute.* Act No. 158 of the laws of 1863 (*Sess. L. 1863, p. 290*), providing for the extension of this road beyond the limits of Keweenaw and Houghton counties to the village of Ontonagon, and confining the appropriation for this extension to lands "not otherwise appropriated or selected by the state as mineral lands," having been passed at the same session with the act in question, would have some force in governing the construction of said act, if both acts applied to roads over the same or similar routes or territory; but the extraordinary powers given to the boards of supervisors of Keweenaw and Houghton counties by the latter act, beyond those usually given in such acts, indicates either that the road through these counties was likely to cost more, and would therefore need a more liberal provision, or that it was a more important public object than that provided for in the former act, and in the light of that fact, the omission from the act in question of the restrictive words "selected by the state as mineral lands," furnishes quite as strong an inference that such omission was intentional, as the existence of said restriction in the former act does of the contrary intent.

*Repealing effect of subsequent legislation.* Act No. 145 of the session laws of 1863 (*Sess. L. 1863, p. 277*), which was passed the day before the act in question, providing for the sale, the same as other such lands are sold, of all swamp and primary school lands in the mineral range of the Upper Peninsula, theretofore withheld from market as mineral lands, except such as the governor should select and reserve, effectually repeals the act of 1846 as to all lands except those which the governor should thereafter select and reserve, and to that extent puts an end to the policy indicated by said act, and gives additional force to the inference that the omission in the act in question of any exception or reservation of mineral lands was intentional.

*What not evidence of reservation of mineral lands.* The unofficial verbal statement of a former deputy commissioner, made after he had ceased to be such,

to the commissioner, that a former governor sanctioned the printed list pub_lished by the commissioner in his report to the legislature for the year 1864, is mere hearsay, and not authentic and official evidence that the governor ever did select or reserve any swamp lands as mineral lands under said act No. 145 of 1863. Such statements are too uncertain to have any bearing upon a question of land titles.

*Mineral lands subject to selection under said act.* After said act No. 145 took effect, which was two days prior to the filing of the first of said lists with the commissioner, none of the lands in question were any longer reserved as mineral lands, but all of them were subject to selection under the act in question, and patents cannot be refused on the ground that the lands are mineral lands.

*Relator not bound by order of selection after the state is released therefrom.* The rule that the relator could not of right have demanded patents for lands otherwise than in the order of their selection as shown by said selection lists, even had the commissioner adhered to it, would cease to operate at the expiration of the period for which the lands were required to be withheld from sale. The selections formerly made, being no longer obligatory upon the state, would cease to be obligatory upon the relator, and the relator would then have the same right to select, and to demand patents (which would be a selection) for, any of the lands still remaining, or any other unsold swamp lands in the Upper Peninsula, as if no former selection had been made. But any sales made by the state to individuals, of previously selected lands, after they ceased to be withheld from sale and prior to a demand by the relator for patents, would be valid and the relator would lose all right to the lands so sold.

*The rights of parties not served with process not passed upon.* Where patents have already issued to parties who have disposed of the lands so patented, to other parties who have not appeared to show cause, and upon whom no process has been served, the rights of such parties will not be passed upon in this proceeding, nor will this court order the issuing of another patent for such lands.

*Query as to invalidating prior patent.* Whether this court could, in this proceeding, invalidate the prior patent in such case, and whether this can be done in any way except by *scire facias* for that especial purpose, or by bill in chancery: —*Quære?*

*Judicial notice.* This court will take judicial notice of the law under which a contract may be made with the state, such as to authorize the contractor to reserve lands from sale, but not that such a contract has, in fact, been made.

*Cause retained for further proceedings as to parties not served.* Where it appears from the answer of the commissioner that certain lands were "reserved" to Charles T. Avery, "contractor," prior to their selection by the relator, and there is no proof of service upon said Avery of the order to show cause, and no reason is shown why it was not served, this court will not pass upon his rights until he has had an opportunity to be heard, but will retain the cause for further proceedings as to him and other parties not notified, so as to give the relator a further opportunity, if desired, to bring them in.

*Mandamus granted.* It appearing that the relator was entitled to patents of lands as demanded, in accordance with the principles above enunciated, and that the grounds for refusing the same were untenable, *mandamus* will be granted to compel the issuing of the patents accordingly.

*Heard April 6.   Decided July 11.*

Application for *mandamus*.

The facts are fully set forth in the opinion.

*Norris & Uhl*, for the relator.

*Dwight May, Attorney General,* for the respondent.

CHRISTIANCY, J.

This is an application for a mandamus, to compel the commissioner of the state land office to cause patents to be issued to the county for certain selections of swamp lands, appropriated to the county by the act of March 20, 1863, for the construction of the Mineral Range State Road.

The third section of the act provides "that whenever any ten consecutive miles of said road shall be completed and approved of by the board of supervisors of the county in which said road shall have been built, and such approval certified to by the chairman of such board of supervisors, the clerk thereof shall serve notice of such approval on the commissioner of the state land office, who shall issue patents to the county in which said work shall have been so completed, conveying to said county twenty sections of said swamp lands to be selected by such board of supervisors."

Section 4 provides "that there shall be withheld from sale, not exceeding 1,280 acres of the swamp lands in the Upper Peninsula (not otherwise appropriated), for each mile of said road, from, and after, the time said counties through which said road runs shall notify the commissioner of the state land office of the selection of the same; and said lands shall be so withheld from sale for the period of four years from the passage of this act." This act was subsequently extended by the amendment of February 20, 1865 (act No. 65), so as to read "six years from the passage of the act." This fourth section was evidently intended to give to the respective counties the right to make the selection at any time after its passage, as well before, as after, the work was done. But it withdrew nothing from market until the commissioner should be notified of the

selection. The time which would govern, as to the right of selection, would, therefore, necessarily be the time of such notice to the commissioner. If the land selected was not then excepted or reserved from the operation of the appropriation made by the act, the county would be entitled to patents for the due proportion of the lands thus selected, as each ten consecutive miles of the said road should be completed, according to the provisions of the third section.

On the 21st April, 1863, the county of Houghton, by unanimous resolution of the board of supervisors, accepted this appropriation. The whole length of the said road through the county of Houghton was forty-two miles, and the whole quantity of land, therefore, which the county was entitled to have reserved from sale, and for which (when the road should be completed) it would be entitled to patents, was fifty-three thousand seven hundred and sixty acres.

On the 20th day of June, 1863, the county of Houghton duly notified the commissioner of the land office, of the selection of a long list of lands, containing in the aggregate twenty-seven thousand and eighty-three and forty-four one-hundredths acres, fully describing them in said list (which was duly filed in the office) by their proper land-office descriptions, according to the public surveys. And on the 23d day of June, 1863, the county filed in the office of the commissioner another list of lands selected by the county, and thereby notified him of such selections, properly describing the lands, and which amounted in the aggregate to thirty-one thousand four hundred and sixty-nine and ninety-four one-hundredths acres, making with the twenty-seven thousand and eighty-three and forty-four one-hundredths acres, fifty-eight thousand five hundred and fifty-three and thirty-eight one-hundredths acres. But, being entitled in all, to only fifty-three thousand seven hundred and sixty acres, there was an excess of four thousand seven hundred and

ninety-three and thirty-eight one-hundredths acres, beyond the amount to which the county was entitled, arising, of course, from the excess in the list selected June 23, 1863.

These selections were made from plats forwarded to the county of Houghton, from the state land office, purporting to show unentered state swamp lands. And the excess upon the last list of selections was doubtless intended to make up for any deficiency which might have been caused by sales made in the meantime, and for any errors which might have occurred, etc. But the county had no right to select or keep out of market any more than the fifty-three thousand seven hundred and sixty acres, and, as more was selected, we think the right of selection must be held to attach to each parcel in the order of its selection, or, in other words, in the order in which the several descriptions were mentioned on the lists, beginning at the head of the first list of June 20th, and going through that in consecutive order, and then proceeding with the second list (that of June 23d) in the same order until the quantity selected should, in the aggregate, amount to fifty-three thousand seven hundred and sixty acres. The remainder, not being subject to selection, could not be affected by it. But in pursuing this order, any particular tract or tracts which might have been sold before the commissioner was notified of the selection, and any tract for any cause not liable to be selected (if any such there were) must be entirely omitted, and the list treated, in all respects, as if such tract or tracts had never been included among the descriptions.

An analogous question is raised by the petition and return, as to the order in which the county is entitled to demand patents for the land as the several ten-mile sections of the road were completed. Whether, for instance, upon due proof of the completion of the first ten miles, the county is entitled to

select the corresponding twelve thousand eight hundred acres as it pleases, from the whole fifty-three thousand seven hundred and sixty, without reference to the order of their selection as shown by the lists of selections, or, whether patents can only be demanded in the order of selection as shown by the lists. The commissioner insists that the county can only demand the patents, in such case, in the order of selection, as shown by the lists. He alleges that this rule has been adopted by him in the office, and insists that it is reasonable and just to individuals and to the state.

Had the commissioner adhered to this rule, we are inclined to think he would have been justified in that course, not because it was a rule adopted by the office, but because it would have been in harmony with the design and purpose of the act. If upon the completion of the first ten miles, the county were entitled to demand patents for such lands as it might select from the entire list selected for the whole road, it might obtain perhaps, half, or more, in value of the whole appropriation, for only ten miles of the road, which would be out of due proportion for the amount completed, and this would leave less inducement to complete the balance. But the commissioner, when the first demand was made for patents, did not adhere to any such rule. The list of lands, for which patents were demanded, did not follow this order, and the commissioner, in the main, patented the lands according to the list demanded, refusing some on the ground that they were mineral lands, others upon other special grounds, and many others upon no grounds which we have been able to discover, but departing with those he did patent widely from the order of selection as shown by the selection lists. The order being thus broken by the commissioner himself, it became impracticable to observe such order of selection for the future with reference to the selected

lists, and either the county must be allowed to select, or the commissoner, or no further patents could be issued. Under such circumstances, we think the county, rather than the commissioner, was entitled to select the lands to be patented.

The completion of the first ten miles of the road was duly certified, and filed with the commissioner, in September, 1865; and on the fourth day of June, 1869, like proof of the completion of another ten miles; and in each case, a list was presented to the commissioner, of lands for which patents were demanded, but neither list was in the order in which the lands had been originally selected by the county, in 1863.

The answer of the commissioner insists that some of the lands selected, and for which patents were demanded, were reserved by the state as mineral lands, and not subject to selection under this appropriation, and he refuses to patent them for this reason, and that some of them have, since the selection, been sold by the commissioner to other parties. These parties have been notified, also, to show cause in this proceeding, but have not appeared.

The question whether these lands were reserved as mineral lands, so as not to be liable to selection under this act, is the most important question in the case. The language of the act certainly makes no express reservation or exception of mineral lands. The first section, which is the one expressly making appropriation, makes no exception whatever; but its language applies to all swamp lands belonging to the state, wherever situated. It is in the fourth section only, providing for the selection, that the appropriation is confined to swamp lands in the Upper Peninsula; and here, by way of parenthesis, is inserted the words " not otherwise appropriated." There are no other words in the act in any manner limiting the right of selection. I was at first under the impression that the term "appropriated" might

include lands set aside, or withdrawn from the ordinary course of sale, as mineral lands had been in some instances. But, on a full examination of all the several acts in reference to these swamp lands, of which there are a very great number, I am satisfied that view cannot be maintained; but that the term "appropriated," as used here, can only properly be understood in reference to an appropriation by the legislature, for some purpose similar to that intended by this act,—a disposition of the lands in some way, by which the state is to part with the title,—and that, therefore, there is nothing in this act itself to withdraw from its operation any swamp lands which might belong to the state in the Upper Peninsula, whether classed as mineral lands or not.

The commissioner, and the attorney general, in support of his views, relies upon the act of April 25, 1846 (*Comp. Laws, Chap. 83*), passed some years before the grant of these swamp lands to the state, and upon act No. 158 of 1863. Section 3 of the act of 1846, relied upon, is in is in these words: "All lands known to contain mines or minerals which now are, or may hereafter become, the property of this state, shall be reserved from sale by the authorities thereof, until directed to be sold by, and under, such regulations as the legislature shall hereafter prescribe."

This, undoubtedly, declared the policy of the legislature of 1846; but, being a mere legislative provision, not contained in the constitution, it was just as clearly repealable by any subsequent legislation, as any other act passed by that, or any other legislature; and any act clearly inconsistent with it, would thus far repeal it. It was just as competent for the legislature of 1863 to appropriate swamp lands which were mineral lands, and even those previously set apart by the state, as such, as to appropriate any other swamp lands.

The act, *No. 158, approved March 19, 1863,* for the extension of this road (for "The Mineral Range State Road," was first provided for by the third clause of Section 13 of the act of 1861, *Laws of 1861, p. 474),* provides for the extension of the road *beyond the limits* of Keweenaw and Houghton counties, to the village of Ontonagon. And this act, it is true (like several other road acts appropriating swamp lands), for *this extension,* confines the appropriation to land "not otherwise appropriated or *selected by* the state as mineral lands." And it is insisted that, as this act and act No. 239 of the same session, now in question, are *in pari materia,* the limitation mentioned in the former should apply to the latter, though not expressed in it. There would be some force in this position if both acts applied to the same road, or to a road over the same ground. But as it may cost twice as much, owing to the difference of route, to build a road over one route or portion of territory, as the same length of road would cost in another, and one may be of much more public importance, and, in the opinion of the legislature, deserve much more encouragement than another, and, as this act No. 239 indicates, by the extraordinary powers given to the board of supervisors of Keweenaw and Houghton counties, beyond those usually given in such acts, either that the road through those counties was likely to cost more, and would, therefore, need a more liberal provision, or that it was a more important public object than the extension provided for in act No. 158, I think the omission, in act No. 239, of the restrictive words in act No. 158, in reference to lands "selected by the state as mineral lands," furnishes quite as strong an inference that the omission was intentional in the one and not in the other, as of the contrary intent. But there is another act of the same session of 1863 which tends strongly to support the conclusion that such swamp lands, as might

also be mineral lands, were not intended to be excepted from this act of March 20, 1863 (act No. 239). I refer to act No. 145, "to provide for the sale of swamp and primary school lands in the mineral range of the Upper Peninsula, heretofore withheld from sale as mineral lands," the first section of which provides "that all swamp and primary school lands in the mineral range of the Upper Peninsula, heretofore withheld from market as mineral lands, except such sections or parts of sections as the governor shall hereafter select and reserve, shall be re-offered and sold in the same manner, in all respects, as is now provided by law for the sale of other swamp and primary school lands."

Section 2 provides that "before any of the lands thus reserved shall be offered for sale, the governor may, under such regulations as he shall prescribe, cause an examination of such lands by such agents, not exceeding two in number, as he may appoint for that purpose, whose duty it shall be to examine the lands designated by the governor, and report the result of such examination to him, and their separate appraisal of the value of each tract."

Section 3 provides that "upon receiving such report, the governor and state treasurer shall fix a minimum price at which each tract may be sold, and certify the same to the commissioner of the state land office, who shall thereupon offer said land at public sale, in pursuance of the provisions of existing law."

This act effectually repealed the act of 1846, as to all lands except those which the governor should thereafter select and reserve. As to all others, it put an end to the policy indicated by the act of 1846; and this act having been passed the day previous to that of March 20 (No. 239), gives some force to the inference that the omission in the latter act of any exception or reservation of mineral lands was intentional, and that they were not intended to

be excepted. It appears expressly, by the third and final answer of the commissioner, that there is no official or authentic evidence, in his office, that the governor ever did (under this act No. 145) select or reserve any of these swamp lands as mineral lands. The unofficial, verbal statement of a former deputy,—after he had ceased to be such,—made to the commissioner, that Governor Blair sanctioned the printed list published by the commissioner in his report for the year 1864, is mere hearsay, and altogether of too unofficial and uncertain a character to have any bearing upon this question of land titles, or upon the right of the county to select any of the lands.

These swamp lands, therefore, were not, after this act No. 145 took effect, any longer reserved as mineral lands; and whether the governor might not, after the selection made by the county, have proceeded to make such selections and reservations, and thus have defeated the selections, to this extent, we need not decide; as it is not pretended that there is any evidence that this was done. This act No. 145 took effect two days prior to the filing with the commissioner of notice and list of the first selections; and, as already noticed, the right of selection must depend upon the law as it stood when the commissioner was notified of the selection. At this time, then, the lands in question were subject to sale at public auction; and it makes no difference that they were not then subject to private sale. There is nothing in the act of appropriation (No. 239) confining the right of the county to select, to lands subject to private sale at the minimum price; and, to give it this effect, we should be compelled to add to the act a provision or reservation which the legislature did not see fit to insert. This we have no right to do, however unwise we might deem the omission; there being nothing from which such an intent can be inferred.

23 MICH.—36.

The result is, I think, that none of the selections could be disregarded by the commissioner on the ground that the land had been reserved as mineral lands; that the sales made of them by the commissioner to the state, as well as to individuals, were void, and that patents cannot be refused simply on the ground that they were mineral lands.

It is proper to explain here more fully what has already been intimated, that, though the county, while the selections made by it remained in full force, and the selected lands were by the statute reserved from sale, could not of right have demanded patents for lands otherwise than in the order of their selections as shown by the selection lists, this rule, even had the commissioner ever adhered to it, would cease to operate at the expiration of the period for which the lands were required to be withheld from sale. The selections formerly made, being no longer obligatory upon the state, would cease to be obligatory upon the county; and the county would then have the same right to select, and to demand patents (which would be a selection) for, any of the lands still remaining, or any other unsold swamp lands in the Upper Peninsula, as if no former selection had been made; and any sales made by the state to individuals, of previously selected lands, after they ceased to be withheld from sale and prior to a demand by the county for patents, would be valid, and the county would lose its right to the lands thus sold.

These remarks, aside from their general application to the case, are especially applicable to the lands stated by the commissioner's answer to have been sold to P. J. Avery and H. S. Wells, June 14, 1869, as well as to all the lands for which patents were demanded on the fourth day of June, 1869, and stated by the commissioner to have been sold to S. F. Seager, June 7, 1869, after such patents were demanded by the county. And the same remarks are

equally applicable to the land stated by the commissioner to have been sold to Hoppenyan, May 19, 1868, and those applied for by Seager, in March or April, 1868 (even if such application were good in other respects and sufficiently shown), since the lands were then duly reserved to the county, and no subsequent application was made, nor any sale to Seager afterwards.

As none of the lands were sold by the commissioner between the 20th of March, 1869, and 4th of June, 1869, it does not become important to inquire whether the six years (during which the selected lands were to be withheld from sale) mentioned in the amendment of 1865 (act No. 65) began to run from the passage of the latter act, or from the passage of the act amended (of March 20, 1863) especially as the demand for the patents, June 4, 1869, was accompanied by proof of the completion of the second ten miles of road prior to the 20th of March, 1869.

The county is therefore entitled to patents for the lands for which patents were demanded, and which the answer states to have been sold to Avery and Wells, June 14, 1869, to Hoppenyan, May 19, 1868, and to Seager, June 7, 1869, and those stated as applied for by Seager in 1868.

The principles above stated, it is believed, will dispose of all questions touching any of the particular descriptions in question, upon which, in the present situation of the case, we feel at liberty to decide.

There are several tracts of the selected lands which, it appears from the commissioner's answer, had been sold to individuals; and as their rights are involved in this proceeding, an order was made for such purchasers to show cause. But one of those parties, Proctor P. Cowles, has appeared, who shows that he received a patent for the lands in question in

his case, September 10, 1868, and that since the issuing of the patent, to wit, January 11, 1869, he conveyed the land to Elisha T. Loring, of Boston, Massachusetts. But no measures have been taken to bring in Loring, and he has not appeared. We do not, therefore, feel at liberty to try his rights in the present proceeding, or to order the issuing of another patent; nor are we satisfied that we could, in this proceeding, invalidate the prior patent, nor that this can be done in any way except by *scire facias* for that special purpose, or, perhaps, by bill in chancery.

The commissioner's answer claims that some of the lands were "*reserved*" to Charles T. Harvey, "contractor," prior to their selection by the county; but he does not assert the existence of any contracts under which such a reservation can take place; and though we can take judicial notice of the law under which such contracts might have been made, we cannot judicially notice whether any contract has been made. There was an order for Harvey to show cause, but no proof of the service of the order, nor any reason shown why it was not served. We do not, therefore, feel at liberty to take a step in the dark, which might prejudice any rights he may have, before he has had an opportunity to be heard. The case, however, may be retained for further proceedings as to the parties not yet notified, so as to give the relator a further opportunity to bring them in should it be desired, unless the county should elect to select other unsold lands in place of this tract.

The relator is entitled to a *mandamus* as prayed for, as to all the lands to which, upon the principles above laid down, the county is entitled to patents. But as we suppose the commissioner was only desirous of obtaining the opinion of this court before issuing the patents, and that he will at once conform to it, we

do not suppose the actual issue of the writ will be required. Should it be required, however, the counsel for the relator will draw up the necessary order, describing the lands to which it applies, and present it to the court for final action.

The other Justices concurred.