STATE, EX REL. THOMAS H. BENTON V. S. M. ELDER.

[FILED JANUARY 14, 1891.]

1. **Elections:** LEGISLATIVE CANVASS: DUTY OF SPEAKER. At the general election of 1890, T. H. B., who was eligible, was a candidate for the office of auditor of public accounts, and received, as shown by the returns, a plurality of all the votes cast for said office; within twenty days thereafter, J. B., who was also a candidate for said office at said election, served upon T. H. B. notice of contest of the election to said office, and of the times and places of taking testimony in support of his contest; which testimony was taken and forwarded to the secretary of state before the meeting of the legislature. On January 6, 1891, both houses of the legislature met and were duly organized by the election of S. M. E. speaker of the house of representatives, and of other officers, who took the oath of office, on which day each house of the legislature assembled in the hall of the house of representatives to be present at the opening and publishing, by the speaker, of the returns of said election for officers of the executive department, which had been sealed up and transmitted by the returning officers to the secre-

tary of state, directed to the speaker of the house of representatives, which returns had been delivered to S. M. E. as speaker, who refused to open and publish the same in the presence of a majority of both houses of the legislature. Upon an application by T. H. B. for *mandamus* against the speaker to compel the performance of said duty, *held,* that it was the duty of S. M. E., immediately upon the organization of the house, and before proceeding to any other business, to open and publish said returns of election.

2. ———: ———: ———. That to perform said acts was especially enjoined upon S. M. E. by law as a duty resulting from his office of speaker of the house of representatives.

3. ———: ———: ———. That the duty so imposed upon him was a ministerial duty positively imposed by law, in regard to which he was vested with no discretionary power.

4. ———: ———: ———: MANDAMUS. That it was a duty which would be enforced by writ of *mandamus.*

5. ———: ———: PUBLICATION OF RETURNS NOT TO BE POSTPONED. That S. M. E. was not relieved of this duty by a vote or resolution of the joint convention of the two houses directing him not to open and publish said election returns until after the trial and determination of the pending contest, nor by the vote, or resolution, of said joint convention referring said returns to the consideration of a committee.

ORIGINAL application for *mandamus.*

*John D. Howe, J. C. Cowin, Chas. L. Hall,* and *E. E. McGintie,* for relator.

*Lamb, Ricketts & Wilson, Allen, Robinson & Reed,* and *V. O. Strickler, contra.*

No briefs filed.

COBB, CH. J.

The relator made his formal application for a writ of *mandamus* to compel the speaker of the house of representatives to open and publish the returns of the general election held on November 4, 1890, in the presence of a majority of each house of the legislature, before proceeding

to other business, alleging that he is a citizen of the United States, and an elector of this state, and that he was, at the time of the last general election, and for more than two years prior thereto had been, of the age of thirty years, and was eligible for election as auditor of public accounts, and at said election was the regular nominee of the republican party, receiving 73,912 votes, being the highest number of votes cast for any candidate for said office, and a plurality of all the votes so cast at said election; that the returns showing the result of the election have been heretofore delivered to the secretary of state, and by him delivered to the speaker of the house of representatives, showing the vote cast for said office as stated; and that the house of representatives of the twenty-second session of the legislature has been duly elected and organized by the election and qualifying of S. M. Elder as speaker; that George D. Meiklejohn is the lieutenant governor and presiding officer of the senate, which is duly organized, and on January 7, 1891, both houses of the legislature were assembled in the hall of the house of representatives at 3 P. M., as required by section 4 of article 5 of the constitution of this state, for the purpose of witnessing the opening and publishing of the returns of the election of executive state officers at the last general election; that at said joint assembly the lieutenant governor presided, and demanded of the speaker of the house of representatives that he open and publish the returns of said election which had been then and there placed in his possession, sealed and unopened, together with an abstract of such returns by the secretary of state, as required by law, and that said speaker of the house of representatives then and there neglected and refused to open and publish said returns, and still neglects and refuses so to do; for the reason that contests over the several executive state offices have been instituted, and evidence therein has been taken and returned to the secretary of state, which the speaker assumes to claim should be

heard and determined first by the legislature before opening and publishing the said returns.

The relator alleges that, upon the face of the returns and upon the general abstracts thereof, he is duly elected auditor of public accounts of this 'state, and that certain others have received the greatest number of votes for various other executive state offices, and for representatives in congress; and that if said speaker would duly perform his duties under section 4 of article 5 of the constitution of this state, in opening and publishing the returns of said election, the relator would be declared duly elected to the office of auditor of public accounts, and that certain others having received the greatest number of votes for various other executive state offices would be declared duly elected thereto; but that by reason of his neglect and refusal the relator is greatly damaged, and is without adequate remedy at law, and wholly without remedy, as well as certain others elected to various other offices, except by the interposition of the highest judicial authority of the state, by its writ of *mandamus*, enforcing the provisions of the constitution in this exigency, with prayer for that relief.

Notice of application for the writ of *mandamus* and a copy of the relator's information were duly served on the speaker of the house of representatives on January 7, 1891, who answered, as respondent, that he appeared at the bar of the supreme court from courtesy and not in recognition of its jurisdiction over him as the speaker of the house of representatives and the presiding officer of the joint convention of the senate and house of representatives.

The respondent set up that as such speaker and presiding officer he represents an independent and co-ordinate branch of the government, and that over his acts, or his failure to act in such capacity, the court has no jurisdiction; that the matters charged in the information relate wholly to the political branch of the government of the state, and are not within the jurisdiction of the court.

Second—That he denies that George D. Meiklejohn was the presiding officer of the joint convention of the two houses of the legislature on January 7, 1891, but that he, the respondent, was, and is, under the constitution and laws of this state, the sole presiding officer of such convention, and presided on January 7, 1891; that within twenty days after the last general election, and within the time required by law, John Batie contested the election of the relator to the office of auditor of public accounts, a notice of which he herewith exhibited; that in pursuance of which a large volume of evidence has been taken tending to impeach the integrity and validity of the returns of said general election, which evidence is now in the office of the secretary of state; that on January 6, 1891, a copy of the notice of such contest was filed with the respondent notifying him of all the important facts and circumstances therein; that on January 7, 1891, by agreement between the two houses, the legislature assembled in the hall of the house of representatives in joint convention, pursuant to the provisions of the constitution of this state, for the purpose of opening and canvassing the returns of the last general election, and of hearing and determining the contests pending therein, and among others that of the relator, and, in pursuance of his duties as speaker, the respondent presided over said convention of the two houses and announced to a majority of the members thereof that he held the returns of the last general election, together with the notices of contest thereon, and asked directions as to the disposition thereof; that a resolution was adopted referring the election returns, with said notices of contest, and the evidence thereunder, to a joint committee of nine members of the house of representatives and six members of the senate to canvass the returns and hear the contests, and make report thereon, which committee respondent appointed, and the matter of opening and canvassing the returns, as well as that of contest pending, was taken out

of the power and control of respondent by the resolution of the joint convention which is herewith exhibited; that while respondent did not open and publish the returns of said election, he did not refuse to do so, as the only body having authority to make such request or demand was the joint convention, which made no such request, but, on the contrary, duly passed the resolution referred to; that the relator has never made any demand on respondent to open and publish said returns, and respondent expressly denies that he refused to open the returns, but alleges that the joint convention took the matter out of his hands in the manner and by the means stated, the record of which is herewith submitted.

To this answer the relator demurred, alleging that it is not a sufficient defense to the complaint laid in the information; and the respondent electing to stand on his answer, the issues joined were argued to the court and submitted.

Preliminary to the defense, set up by the respondent to this application, he objects to the jurisdiction of the court, and appears at the bar from courtesy only, and not in recognition of its jurisdiction over him as speaker of the house of representatives, and the presiding officer of the joint convention of the two houses.

The second section of the sixth article of the constitution of this state, after providing that the supreme court shall consist of three judges, a majority of whom shall be necessary to form a quorum, or pronounce a decision, further provides that "it shall have original jurisdiction in * * * *mandamus, quo warranto, habeas corpus,* and such appellate jurisdiction as may be provided by law."

Section 645 of the Civil Code of Procedure, of this state, provides that "The writ of *mandamus* may be issued to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." * * *

Section 646 declares that "the writ may not be issued in any case where there is a plain and adequate remedy in the ordinary course of the law," but "may issue on the information of the party beneficially interested."

It will be observed that the respondent's serious ground of objection to the jurisdiction of the court rests on the allegation that he is the speaker of the house of representatives and the presiding officer of the joint convention of the two houses. The letter of the statute makes no exception in *mandamus,* in favor of the functions of such officer; so that if he is a person upon whom the law has specially enjoined the performance of an act, or acts, as a duty resulting from an office, trust, or station, he is, in the face of all cavil, within the letter of the Code, subject to *mandamus,* and to the jurisdiction of the court therein. But this objection of the respondent is doubtless based upon his view and construction of the second article of the constitution, that "the powers of the government are divided into three distinct departments, legislative, executive, and judicial; and no person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter provided."

This article has heretofore been subject to judicial scrutiny and construction : First—In the case of *Turner v. Althaus,* 6 Neb., 54, an action was brought to restrain the treasurer of Douglas county from selling certain lands in the city of Omaha, not laid out into blocks and lots, for delinquent taxes, under certain statutes then in force. The opinion is that of the late Chief Justice GANTT, then sitting upon this bench. In considering the want of power in the courts to declare an act of the legislature void on the grounds of injustice and inexpediency he said: "The doctrine seems to be equally well settled 'that no court can pronounce an act of the legislature void' because it may be imperfect or impolitic, or 'for any supposed inequality or

injustice in its intention or its operation, provided it be upon a subject-matter fairly within the scope of legislative authority,' and to bring the validity of a legislative act within the control of the judiciary, it must be clearly subversive of the constitution. There is no mixed power, partly legislative and partly judicial, to be exercised in concert, or in common, by the legislative and judicial departments of the government. The courts have no right to legislate, and the legislature has no right to adjudicate, for the reason that the line which separates them in the exercise of power is clear and distinct, and this principle is well settled and understood. It is said that if the courts were to declare an act unconstitutional, merely because * * * we may consider such act wrong and unjust, 'it would be assuming a right to change the constitution—to supply what we might conceive to be its defect—to fill every *casus omissus*, and to interpolate into it whatever, in our opinion, ought to have been put there by its framers.' "

In the case of the *Lincoln Building and Saving Association v. Graham*, 7 Neb., 173, the same judge, then chief justice, in delivering the opinion, said: "It is well understood, as a fundamental principle in our system of government, that the making of statutory laws, and their exposition and application to cases as they arise, are clearly and distinctly two different functions. The former is allotted by the constitution to the legislature, the latter to the courts."

And again, on January 23, 1883, the legislature being in session, the house of representatives, by resolution, submitted to the court for answers the following questions:

·I. Would railway commissioners be state executive officers, or would the office of railway commissioner of the state be a state executive officer if created by the legislature?

II. Would such an office, if created by the legislature, come within the inhibition of the constitution?

·III. Would·a·law regulating the management of rail-

State, ex rel. Benton, v. Elder.

roads in Nebraska, under the commissioner system, be obnoxious to any provision, or provisions, of the constitution of this state?

In response to these inquiries, the court, after quoting article II, that "the powers of the government of this state are divided into three distinct departments—the legislative, executive, and judicial"—and stating the provisions of articles III, IV, V, and VII, replied that "the powers of the state government, being thus divided into three distinct departments, it is clearly incompetent for the legislature to create a commission and invest it with any official power, without assigning the duties thereof to one or the other of them.   *   *   *   Even were it not inhibited by other clauses of the constitution, we do not think that it is desired or contemplated to invest such commission with the power to make laws, or even to interpret or apply them, but that such duties would be to aid in carrying the laws into effect.   Hence their duties would be executive, and if state officers, if paid from the state treasury, and their field of duty co-extensive with the territorial limits of the state, they would be state executive officers."

In these examples the court observed the literal sense of article II of the constitution, construing its meaning and intent to be that the respective duties incumbent upon and applicable to each separate department of the government are confined to it alone; but did not take the view, nor can it now, that where an officer of either the legislative or executive departments, or the judicial, shall refuse to execute an imperative duty, imposed by law upon the office of the incumbent, to the detriment and prejudice of a citizen or of the public, through this constitutional provision, while the courts have full power of redress in cases of delinquent judicial officers, they are prohibited from considering any flagrant violation of the constitution or laws by officers of the other departments, lest the courts trench upon their prerogative.

12

No such limited and sinister construction can be placed upon the second article without violating the spirit of the first, and violating many of its provisions.

In the recent application for *mandamus*, of Bates, relator, against the governor and the state board of canvassers (*ante*, 82), to certify the election of the relator to a judicial office, we held that in a proper case to enforce the performance of a ministerial duty, which the law specially enjoins as incident to an office, the writ would issue against officers of the executive department, and even against the supreme executive authority. Since that opinion, I have again examined the leading cases holding adversely: that of the *Governor of New Jersey*, 1 Dutcher, 331; *of Arkansas*, 1 Ark., 570; *of Maine*, 32 Me., 508, in all of which the court, in considering the public and political aspect of the question presented, seemed to lose grasp of the no less important one of the rights of parties to a redress of grievances against those in high temporary power, as well as those in lower official station. It is held in the cases cited that the officers of each department of state government are responsible directly to the people, and not to the judicial department, for their acts. This doubtless means that an aggrieved party—for example, one who had been elected to an office the returns of which had been refused to be canvassed and certified by a state board of canvassers—has no right of remedy in the courts, nor other redress than his future opposition to the exercise of arbitrary power as one of the people. This policy, if followed to its conclusion, would tend to make elections uncertain in result, doubly so as to the result declared, and would leave the payment of the state's indebtedness, even after legislative appropriation, absolutely dependent upon the vacillating will of approving and disbursing officers. But such has never been understood to be the law of this state. On the contrary, its law reports are strewn with precedents, too numerous and familiar to require citation, where officers of

the executive department were required by *mandamus*, on the information of injured parties, to discharge specific ministerial and executive duties. The sections of the Code cited make no distinction in the persons to be compelled to the performance of an act which the law specially enjoins as a duty resulting from an office, on account of any one of the three departments to which such person may belong; nor do I think it probable that the framers of the Code intended to confine the jurisdiction of the courts to judicial officers alone.

The rule laid down by an author of acknowledged merit and authority as to ministerial duties of public officers is deemed of importance to the present proceeding:

Most public officers, whatever the nature of their office or the source of their authority, are entrusted with certain duties concerning which they are vested with no discretionary powers, and which are either positively imposed upon them by express law or necessarily result from the nature of their office. These duties, being unattended with any degree of official discretion, are regarded as ministerial in their nature, and the officers at whose hands their performance is required are, as to such duties, ministerial officers. The distinction between obligations of this nature, and those calling for the exercise of judicial discretion and some degree of judgment is obvious. It is a distinction frequently noticed, and perpetually recurring, in any analysis of the principles underlying the law of *mandamus*. And while the courts have steadily refused to lend their extraordinary aid by *mandamus* to control in any degree the exercise of official discretion, wherever vested, yet as to official duties of a ministerial character, unattended with the exercise of any degree of discretion, and absolute and imperative in their nature, the law is otherwise. And it may be asserted as a rule of universal application that, in the absence of any other adequate and specific legal remedy, *mandamus* will lie to compel the performance of purely

ministerial duties, plainly incumbent upon an officer by operation of law or by virtue of his office, and concerning which he possesses no discretionary powers. Or, in other words, wherever a specific duty is required by law of a particular officer, unattended with the exercise of any degree of official judgment or element of discretion, and on the performance of which individual rights depend, *mandamus* is the appropriate remedy for a failure or refusal to perform the duty. (High's Extraordinary Legal Remedies, sec. 80; *Kendall v. U. S.*, 12 Peters, 524; *Citizens Bank v. Wright*, 6 O. St., 318; *People v. Com'r of St. Land Office*, 23 Mich., 270; *N. W. N. C. R. Co. v. Jenkins*, 65 N. C., 173; *Queen v. Southampton*, 1 Best & Smith, 5; *State v. Wrotnowski*, 17 La. Ann., 156; *State v. Barker*, 4 Kan., 379; *State v. Magill*, Id., 415; *People v. Perry*, 13 Barb., 206; *People v. Taylor*, 34 Id., 401; *People v. Minor*, 37 Id., 466; *Silver v. People*, 45 Ill., 225; *Strong's Case*, Kirby, 345; *State v. Meadows*, 1 Kan., 90; *Simpson v. Register of Land O.*, Sneed Ky. Dec. [2d Ed.], 217; *People v. Collins*, 7 Johns. Rep., 549; *People v. Canal Appraisers*, 73 N. Y., 443; *People v. Shearer*, 30 Cal., 645; *Hempstead v. Underhill's Heirs*, 20 Ark., 331, and other cases there cited.)

The respondent is an officer of the legislative department. The duty which it is sought to compel him to perform the law specially enjoins upon him, as resulting from his office as speaker of the house of representatives, by sec. 4 of art. 5 of the constitution, requiring that "The returns of every election for the offices of the executive departments shall be sealed up and transmitted by the returning officers to the secretary of state, directed to the speaker of the house of representatives, who shall, immediately after the organization of the house, and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, who shall for that purpose assemble in the hall of the house of representatives. The

person having the highest number of votes for either of said offices shall be declared duly elected; but if two or more have an equal and the highest number of votes, the legislature shall, by joint vote, choose one of such persons for said office. Contested elections for all of said offices shall be determined by both houses of the legislature, by joint vote, in such manner as may be prescribed by law."

In repeated decisions of this court, and I take it to be the settled law of the state, if the county clerk, or any of the county officers, should refuse or neglect to send up to the secretary of state the returns contemplated in sec. 4, art. 5, and application were made to this court for correction and compliance, its power and its duty to compel by *mandamus* the performance of that duty, by the county officer, is not questioned. If, upon the returns being lodged with the secretary of state, that officer should refuse to place them, or any one of them, in the hands of the speaker, at the precise hour for the discharge of that duty, the court could not refuse its process to compel him to fulfill his office in accordance with the letter of the constitution.

We know of no good reason, nor has any been suggested, why this officer, appointed to perform the ministerial duty of opening and publishing these returns, should be specially taken out of the pale of law any more than other officers. It is true that his duty is to be done in the presence of a majority of the two houses, and the result is to be declared and published, as a constitutional duty, not to be controlled by the joint convention, nor subject to be diverted from its appointed purpose by any reference or submission to a proposed committee, as set up in the respondent's answer. Such a procedure would seem to be an attempt to evade the duty, or subvert its ends, or to transfer it to an agency not sanctioned by the constitution. That process would include the liberty of taking the returns from the speaker's possession, out of the body of the two houses, possibly away from the capital of the state and

from the control of any lawful authority. · This would be a condition not contemplated and not sanctioned by any law. The returns are the official history and evidence of the election, and are all that can be recognized as such. There is no substitution, and we cannot but admit the possibility of such accidents as have sometimes overtaken disputed election returns, to the disappointment of the public. The framers of the constitution were careful to provide against that condition and its possible evils in this state.

The demurrer of the relator must be sustained to that part of the answer setting up the refusal of the respondent to open and publish the election returns upon the vote of the joint convention referring the same, for report and resolution, to a select committee. No legislative body has the power to interpose a parliamentary contrivance in contravention of the express provisions of the constitution of the state. It alone is the law governing this question. And wisely has the constitution provided a method of contesting elections, to be kept separate and distinct from the canvass and publication of the returns. The last is a duty devolved upon the speaker of the house of representatives every two years. Fortunately, to the present time, in this state, there have been no contests for any of the state offices, and it may be hoped there will be a long future before us until it shall occur again. The duty of the speaker to open and canvass the returns and declare the result, whether there is any contest or not, must recur every two years, upon the election of state officers, and that duty has no relation whatever to the trial of a contested election, and we hold, confidently, that the demurrer to the answer, setting up the proposed contest of the state officers as a defense, must be sustained. It would seem utterly impossible to enter upon such contest at once, while the constitution prescribes that the respondent's duty must be first performed to the exclusion of any other business;

and we must declare- that whatever legislative acts may have been, or shall be done prior to the discharge of this duty, are and will be null and void. Therefore the relator will take his writ.

MAXWELL, J.

I concur in what is said by Judge COBB in this case.

Sec. 4, art. 5, of the constitution declares that the speaker of the house of representatives shall, immediately after the organization of the house, and before proceeding to other business, open and publish the returns in the presence of a majority of each house of the legislature, who, for that purpose, shall assemble in the hall of the house of representatives. This, in effect, makes the two houses of the legislature a canvassing board, with the speaker of the house of representatives, who is presumed to have been chosen because of his ability and integrity, the active agent in adding up the votes cast for the different candidates and ascertaining therefrom the persons elected for the several offices, which the speaker is required to declare. This canvassing board is presumed to be entirely non-partisan because all parties are represented, or presumed to be, in the legislature.

The object of the framers of the constitution no doubt was to place the canvass in the hands of a body which would faithfully perform its duty. In no sense is the canvass of the votes a legislative duty. It might have been imposed on any other body of officers and the duties would have been precisely the same as in the case at bar, viz., to add up the number of votes cast for the several candidates and declare the result. This duty is required by the constitution to be performed immediately after the organization of the house. Thus, the legislature meets at 12 o'clock M. on the first Tuesday in January, and the officers elected as shown by the returns are required to qualify and

enter upon the duties of their respective offices on the
Thursday following  The term of each of the state offi-
cers is two years and sessions of the legislature are held
biennially.  Thus at the commencement of the regular
session of each legislature new state officers, or those who
have been re-elected, enter upon or continue in the duties
of their respective offices; in effect a new administration
of the affairs of the state is inaugurated with each regular
session of the legislature.  This is important to be kept
in view in considering the limitation upon the power of
the legislature to transact any business except to complete
its organization before canvassing the votes and declaring
the result of the election.  It is said, however, that as
members of the legislature in all cases, except treason,
felony, or breach of the peace, shall be privileged from
arrest during the session of the legislature and for fifteen
days next before the commencement and after the termina-
tion thereof, as provided in sec. 12 of art. 3 of the consti-
tution, therefore, in case the speaker should refuse to per-
form his duty he could not be arrested and punished for
contempt in refusing to obey the order of the court.

A constitution, like a contract or statute, must be con-
strued together and every part thereof given effect if pos-
sible.  The provision of the constitution is merely a re-
enactment of the common law.

The privilege of the member is not the privilege of the
house merely, but of the people, and is conferred to enable
him to discharge the trust confided to him by his constitu-
ents.  (*Coffin v. Coffin*, 4 Mass., 27 [S. C., 3 Am. Dec,
189]; Cooley's Constitutional Limitations [6th Ed.], 160.)
In other words, the privilege is conferred to enable the
member to discharge his legislative duties.  Where, how-
ever, the constitution has imposed upon the member purely
ministerial duties this exemption does not apply.  These
duties are to be performed at the beginning of the session
so that the parties elected may enter upon the duties of

their respective offices and the people have the benefit of their services. The presumption is that the legislature will perform its duty, and declare the result. But suppose, through a mistake of the law, it should not perform its duty in that regard : is there no remedy either on behalf of the persons elected to office or of the public? If not, then the boast of the common law that there is no wrong without a remedy is without foundation. Our constitution however, is broader than the common law. Sec. 13, art. 1, declares that all courts shall be open, and every person for *any injury* done him in his land, goods, person, or reputation shall have a remedy by due course of law, and justice administered *without denial or delay.* This is a provision in the same constitution which exempts a member of the legislature from arrest. If, therefore, the rights of a party who has been elected to an office are imperiled by the refusal of a canvassing board, whose duty it is to proceed with the canvass and declare the result, he may confidently appeal to the courts to protect and enforce his rights.

The rule is, that each board is to receive the returns transmitted to it, if in due form, as correct, and to ascertain and declare the result as it appears by such returns. (Cooley's Constitutional Limitations [6th Ed.], 783; *Ex parte Heath,* 3 Hill, 42; *Brower v. O'Brien,* 2 Ind., 423; *People v. Hilliard,* 29 Ill., 413; *People v. Jones,* 19 Ind., 357; *Mayo v. Freeland,* 10 Mo., 629; *People v. Kilduff,* 15 Ill., 492; *O'Ferrell v. Colby,* 2 Minn., 180; *People v. Van Cleve,* 1 Mich., 362; *People v. Van Slyck,* 4 Cow., 297; *Morgan v. Quackenbush,* 22 Barb., 72; *Dishon v. Smith,* 10 Ia., 212; *People v. Cook,* 14 Barb., 259, and 8 N. Y., 67; *Hartt v. Harvey,* 32 Barb., 55; *Attorney General v. Barstow,* 4 Wis., 567; *Attorney General v. Ely,* 4 Wis., 420*; *State v. Governor,* 25 N. J., 331; *State v. Clerk of Passaic,* Id., 354; *Marshall v. Kerns,* 2 Swan., 68; *People v. Pease,* 27 N. Y., 45; *Phelps v. Schroder,* 26 O. S., 549; *State v. State Canvassers,* 36 Wis., 498; *Opin-*

*ion of Justices,* 53 N. H., 640; *State v. Cavers,* 22 Ia., 343; *State v. Harrison,* 38 Mo., 540; *State v. Rodman,* 43 Id., 256; *State v. Steers,* 44 Id., 223; *Bacon v. York Co.,* 26 Me., 491; *Taylor v. Taylor,* 10 Minn., 107; *Opinion of Justices,* 64 Me., 588; *Prince v. Skillin,* 71 Me.; 361 [S. C., 36 Am. Rep., 325]; *Peebles v. County Com'rs,* 82 N. C., 385; *Clark v. County Examiners,* 126 Mass., 282; *State v. County Canvassers,* 17 Fla., 29; *Hagge v. State,* 10 Neb., 51; *State v. Wilson,* 24 Neb., 139; *Moore v. Kessler,* 59 Ind., 152; *State v. Hayne,* 8 S. C., 367.) They may not refuse to canvass because a poll book is not returned as it should be. (*Patten v. Florence,* 38 Kan., 501.) They may and should correct an arithmetical blunder. (*State v. Hill,* 20 Neb., 119.) Legal returns received after the proper time should be counted. (*Cresap v. Gray,* 10 Ore., 345.) And if the canvassers refuse or neglect to perform their duty they may be compelled by *mandamus.* (Cooley's Constitutional Limitations [6th Ed.], 784; *Clark v. McKenzie,* 7 Bush, 523; *Burke v. Supervisors of Monroe,* 4 W. Va., 371; *State v. County Judge,* 7 Ia., 186; *Magee v. Supervisors,* 10 Cal., 376; *Kisler v. Cameron,* 39 Ind., 488; *Commonwealth v. Emminger,* 74 Pa. St., 479; *Clark v. Buchanan,* 2 Minn., 346; *People v. Supervisors,* 12 Barb., 217; *State v. Rodman,* 43 Mo., 256.) To this effect is *State v. Gibbs,* 13 Fla., 55; *People v. Schiellein,* 95 N. Y., 124. In the last case it is held that the board continues as such, in spite of adjournment, till its whole duty is performed. (See, also, *People v. Board of Registration,* 17 Mich., 427; *People v. Board, etc., of Nankin,* 15 Id., 156; *Lewis v. Commissioners,* 16 Kan., 102; *Pacheco v. Beck,* 52 Cal., 3; *State v. Hill,* 20 Neb., 119.) And they may be compelled to make a legal and proper canvass after they have made one which was illegal and unwarranted. (*State v. County Com'rs,* 23 Kan., 264; *State v. Hill,* 10 Neb., 58; *Steward v. Peyton,* 77 Ga., 668; *Simon v. Durham,* 10 Ore., 52.) And if they have finished their work before the time allowed

has elapsed and while they still have the returns, they may be compelled to reconsider their action. (*State v. Berg*, 76 Mo., 136.) This rule applies to all canvassing boards without exception.

By what authority shall the courts discriminate and say, We will compel this board to do its duty, but not that one? In a free government no person is above the law. All are bound by its provisions. "Equality before the law" is the motto of our state, and the practice of that motto the basis of its laws and adjudications. When a person is elected to the legislature he, in effect, agrees to perform all the duties enjoined upon him by the constitution and statutes. Among these duties is the canvass of the returns. In effect, he promises that this duty shall be performed, so far as he is able to effect the purpose in the time and manner required, and if he is elected speaker that he will perform the duties of ascertaining from the returns the votes cast for each candidate and declare the result thereof. In accepting this trust he accepts it with all its incidents, viz.: that for a failure or neglect to perform the duty required, any of the parties aggrieved may invoke the aid of the courts to enforce performance. In effect, such persons waive the privilege of exemption from arrest, etc., in case of failure to perform the trust, and it is the duty of the court to enforce the rights of the parties aggrieved. To illustrate, a member of the legislature is not liable to an action of slander for words spoken in the discharge of his official duties, even though spoken maliciously. (*Coffin v. Coffin*, 4 Mass., 1; 13 Am. & Eng. Encyc. of Law, 406.) This privilege is extended in order that members may freely discharge their duty without fear or favor. This is a power incident to free government and necessary to prevent corruption, fraud, and other wrongs. This privilege, however, is not extended to words spoken unofficially, though in the legislative hall and while the legislature is in session. (*Coffin v. Coffin*, 4 Mass., 1; Odgers, Libel &

Slander, 185; 13 Am. & Eng. Encyc. of Law, 406.)    The same rule applies to acts required of the legislature which are purely of a ministerial character.

But it is said that the legislature is a co-ordinate branch of the government, and that it is entitled to construe the constitution and statutes for itself, and therefore is not governed by the construction ·placed upon it by the supreme court.    That it is a very important, co-ordinate branch of the government is true, and the supreme court has never, except when its action was invoked in some of the modes pointed out by law, sought to construe statutes or constitutional provisions for the legislature.    It is the province of the legislature, however, to pass laws, and of the courts to construe the constitution and laws.    This power has been recognized from the inception of our state government.

One of the duties imposed upon the supreme court is to construe the constitution and laws of the state.    To aid in the performance of this duty the state possesses a law library of nearly or quite 30,000 volumes.    It is the duty of the court to carefully investigate every case brought before it, and, after due consideration, place what is believed to be a correct construction upon the language of any of the provisions of the constitution or of the statutes, and such construction binds every department of the government, including the legislature, and every person within the state.    The construction given by the supreme court becomes the standard to be applied in all cases.    If this were not so, no person would know what the law was upon any given point, as the legislative department might construe it in one way, the attorney general in a different manner, while the state treasurer, auditor of state, and others, place their own construction upon it, and in effect refuse to conform to the construction placed thereon by the court of last resort. ·   However unpleasant the duty, therefore, the court cannot shirk the responsibility of extending its aid when its power is invoked to enforce a public duty or the

State, ex rel. Benton, v. Elder.

protection of private rights. If it refuses, it does so in plain contravention of the letter, spirit, and scope of the constitution. The power is placed in its hands to be wisely exercised without discrimination as to persons or officers—all being equal before the law ; and let it perform its duty faithfully and efficiently as far as possible, however disagreeable such performance may be.

In the answer of the respondent it is alleged in substance that a contest has been instituted against the relator and other state officers named, and that they are deferring the canvass of the votes until after the determination of such contest. This, however, is clearly in violation of the constitution. That instrument requires the parties elected on the face of the returns to be declared elected and inducted into office. It is said that the supreme court has no supervision over other departments of the government. That is conceded. It has not sought to exercise any. Nor has it any supervision over the affairs of any educational institution, railway company, bank, partnership, or individual in the state; nevertheless, if any person aggrieved by any of these parties or others invokes its power in the manner provided by law to redress his wrongs and grant him relief, the courts have authority to entertain jurisdiction and render a decision confirming his rights and redressing his wrongs. The law covers the whole state. It applies alike to every individual therein, be he rich or poor, black or white. The remedy is as broad as the law, and the courts apply the remedy. If this were not so the wealthy corporation or individual might trample upon the rights of the weak or poor and override the law, and justice be despised and defeated.

Every denial of justice, when the relief has been sought in a proper manner, is an act of tyranny, which tends to the subversion of free government. Suppose a party should purchase from the state a portion of its school lands, and pay for the same, and on applying to the secre-

tary of state and governor for a patent should be informed that these officers would not execute a patent and the state would retain the purchase money. Would the purchaser be remediless? If the sale had been fairly made in pursuance of law it would be the duty of these officials to make and deliver a patent for the land, and if they refused to do so the purchaser might with confidence invoke the aid of the courts and compel the execution and delivery of such patent. There would be a plain duty which the officers had refused to perform, and if upon any pretext the court should refuse its aid because the respondents were governor and secretary of state, it to that extent would deny justice and permit the law to be trampled upon with impunity and the rights of parties to be sacrificed. Such a court would not be worthy of the name. In a free government, courts are the means through which actionable wrongs are redressed, and it is no part of their business, except when the matter is in issue, to inquire as to the social or other standing of the parties before it; and any court that stops to make such inquiry weakens respect for the law, blunts its own sense of justice, and is in danger of perverting the law. The questions for the courts are, What are the rights of the plaintiff in the premises as against the defendants? and, after calm, careful, patient investigation of the facts of the case, that it declare the law faithfully and fearlessly as it shall be found to be.

But we are told in the answer that a contest is pending, etc. A contest is instituted by concurrent resolution. Sec. 11, art. 3, of the constitution provides "that every bill and concurrent resolution shall be read at large on three different days in each house." This would require at least six days after the result had been declared and the party had taken possession of his office before the trial could take place. The form of the resolution is a matter for consideration, and is subject to change at any time before its passage. No doubt such resolution may be referred to

a committee, and is subject to debate like any other meas-
ure brought before either house.  In deciding the contest
the legislature should be governed by the evidence, as from
that it is to determine the rights of the party contested.
Suppose one of the grounds of contest is fraud at certain
points in the election, or in receiving ballots, the specific
fraud must be pointed out and the fraudulent votes in
some manner designated.  In weighing evidence it must
do so calmly and dispassionately, like a court, and unless
fraudulent votes are proved to have been cast, sufficient to
change the result, sustain the election as declared by board
of canvassers.  The legislature is a lawful body, elected
and organized in pursuance of the constitution and laws
for a lawful purpose, and while within the limits and re-
strictions of the constitution it may pass any measure it
may deem proper, yet morally it is bound by the same
consideration of fairness and justice which control the
courts, and it is its duty to dispose of election contests in
this manner.  This not unfrequently requires patient in-
vestigation of the evidence, which may require weeks or
even months, in connection with the other duties of the
members, and is wholly irreconcilable with the theory
that the declaration of the result of the election should be
postponed until the termination of the contest.

It seems to be assumed in the answer that the legisla-
ture has the power, and that therefore, at its option, it may
declare whomsoever of the candidates voted for elected.
This is a government of the people, by the people, and for
the people.  The constitution and laws have provided a
mode in which the will of the people shall be ascertained,
viz., by a canvass of the votes, and the persons whom the
people have elected as shown by such returns are to be of-
ficers for the succeeding two years, unless, for causes which
appear behind the returns, they are not entitled to exercise
the duties of such officers.  To ascertain such facts a con-
test is instituted by persons who claim that they were in

fact elected in place of those who have been so declared. This question is to be determined from the evidence, and is not one of *power* but of *right*. Should the procedure set forth in the answer be adopted, the tendency, if not the effect, would be to transfer from the people the election of its own officers and invest the legislature with that duty. If, however, the legislature should find from the evidence that the party holding the office had not been lawfully elected thereto, it may so declare, that he may be ousted from such position.

Evidently it is the duty of the respondent, in the presence of a majority of the members of each house, to open and publish the returns of the election and declare the result, and a writ to that effect should be granted.

WRIT ALLOWED.

NORVAL, J., concurs.